# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF<br>OCEAN ENERGY MANAGEMENT; MATTHEW<br>GIACONA, Acting Director of Bureau of Ocean<br>Energy Management, in his official capacity;<br>BUREAU OF SAFETY AND ENVIRONMENTAL<br>ENFORCEMENT; and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>        Defendants. | C.A. No. 1:25-cv-00439 |

## MOTION FOR PRELIMINARY INJUNCTION

I.    LEGAL BACKGROUND ........................................................................................ 2

II.    FACTUAL BACKGROUND.................................................................................. 4

  A.    State Energy Standards and Solicitation of Proposals ........................................ 4
    1.    Rhode Island ................................................................................................ 4
    2.    Connecticut .................................................................................................. 6

  B.    Federal Permitting of Revolution Wind.............................................................. 8

  C.    Rhode Island Permitting and Approval of Revolution Wind.............................. 11

  D.    The Wind Memorandum and Stop Work Order .................................................. 12

  E.    Harms to Various Stakeholders .......................................................................... 13
    1.    The Stop Work Order Threatens the Viability of the Revolution Wind Project. ......... 13
    2.    The Stop Work Order Harms the States' Energy Interests. ........................... 15
    3.    The Stop Work Order Harms Many Economic and Contractual Interests. .................. 16
    4.    The Stop Work Order Imperils Compliance with State Mandates and the States'
    Ability to Meet Environmental Goals.................................................................... 18

III.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS......................... 21

  A.    The Stop Work Order Is a Final Agency Action that Violates the Administrative
    Procedure Act.................................................................................................... 21
    1.    The Stop Work Order Is Arbitrary and Capricious.......................................... 22
      a.    Agency Defendants Offer No Reasoned Basis for Halting Activities Related to the
      Revolution Wind Project.................................................................................... 22
      b.    Agency Defendants Fail to Explain Their Abrupt Reversal of Their Prior Position.24
      c.    Agency Defendants Fail to Account for Serious Reliance Interests........................ 25
    2.    Agency Defendants' Halt on Wind-Energy Development Is Contrary to Law and Ultra
    Vires.................................................................................................................. 27

  B.    The Suspension Violates OCSLA........................................................................ 30

IV.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
PRELIMINARY RELIEF.................................................................................................... 31

  A.    The States Are Likely to Suffer Harms Imminently............................................. 32

  B.    The Harms the States Will Suffer Will Be Irreparable. ........................................ 33
    1.    The Stop Work Order Infringes on the States' Sovereign Interests and Interferes with
    Their Ability to Comply with State Statutory Mandates. ......................................... 33
    2.    Delaying Revolution Wind Will Lead to More Irreparable Pollution in the States than
    They Would Otherwise Experience. ...................................................................... 35
    3.    The Stop Work Order Will Cause Widespread Economic Harm to the States............. 37

a.　The Stop Work Order's Chilling Effect Has Inflicted, and Will Continue to Inflict, Reputational Harm to the States. ...................................................................................... 37

b.　Without Revolution Wind, Ratepayers—Including the States—Will Pay More for Electricity. ...................................................................................................................... 38

c.　The Stop Work Order Will Waste State Investment and Resources. ....................... 39

d.　Job Losses Stemming from the Stop Work Order Will Hurt the States. .................. 40

4.　The Stop Work Order Makes New England's Grid Less Reliable. .............................. 40

V.　THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF ................................................................................................................ 41

## INTRODUCTION

After years of rigorous environmental review, intergovernmental coordination, and substantial public and private investment, the Revolution Wind Project—a cornerstone of Connecticut and Rhode Island's clean energy future —is now 80% complete and supposed to provide power to Rhode Island and Connecticut consumers next year. But three weeks ago, nearly a decade into the process and almost two years after construction first began, federal officials halted it without statutory authority, regulatory justification, or factual basis. Their unsubstantiated Stop Work Order threatens to imminently and irreparably harm Rhode Island and Connecticut.

In the face of an exhaustive record showing that the Project has been vetted through every layer of the federal and state regulatory process, and despite the States' and others' deep reliance interests, the federal government has arbitrarily reversed course and issued a Stop Work Order without explanation. The Order does not identify any violation of law, any imminent threat to safety, or any judicial decree requiring suspension. It instead directs construction to stop on Revolution Wind so that an office within the Department of the Interior (DOI), the Bureau of Ocean Energy Management (BOEM), can address purported "concerns" it has with the Project. The Order does not indicate what those concerns are or explain how they justify indefinitely halting a Project that BOEM has already extensively reviewed, with the outcome of that review being final approval in all respects.

The Administrative Procedure Act (APA) and the Outer Continental Shelf Lands Act (OCSLA) do not permit such arbitrary, capricious, and unlawful government conduct. They demand reasoned decision-making, fidelity to statutory limits, and respect for the settled expectations of sovereign States and regulated parties.

The Stop Work Order's immediate and indefinite halt on construction constitutes an existential threat to the viability of the Revolution Wind Project. Moreover, it has caused and will

1

continue to cause Rhode Island and Connecticut imminent and irreparable harm by undermining their sovereign interests in procuring renewable energy, frustrating their mandatory compliance with state emission standards, forcing the States to endure avoidable and irreparable pollution, and causing the States unmeasurable economic harms. Each day that passes, these harms become more entrenched. A preliminary injunction lifting the Stop Work Order is not only legally proper, but it is also necessary to stop the imminent and irreparable harms the States are enduring.

## BACKGROUND

### I.      LEGAL BACKGROUND

Wind energy is a highly regulated industry governed by numerous federal permitting laws designed to ensure responsible siting, planning, construction, operation, and decommissioning of projects. For offshore wind projects in federal waters like Revolution Wind, developers must first obtain a lease and then secure approval of a construction and operations plan under OCSLA, 43 U.S.C. §§ 1331–1356. OCSLA governs leasing and permitting for development on "all submerged lands lying seaward and outside of" three miles from the coast, "of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control or within the exclusive economic zone of the United States and adjacent to any territory of the United States"—that is, the Outer Continental Shelf. 43 U.S.C. § 1331(a). Offshore wind projects often also need permits under many other federal statutes.[1]

OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public," and directs the Interior Secretary to facilitate the region's "expeditious and orderly development" while maintaining competition and environmental

---

[1] *E.g.*, 16 U.S.C. § 1536 (Endangered Species Act); 33 U.S.C. §§ 1342, 1344 (Clean Water Act); 16 U.S.C. § 1361 (Marine Mammal Protection Act); 42 U.S.C. § 7401 (Clean Air Act); 42 U.S.C. § 4332(2)(C) (National Environmental Policy Act); 54 U.S.C. § 300101 (National Historic Preservation Act).

2

safeguards. 43 U.S.C. § 1332(3). Under OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, or transmission of energy from sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c.

BOEM administers the Outer Continental Shelf leasing program, including by identifying leasing areas, conducting environmental assessments, and awarding leases, usually through a competitive bidding process. *See* 30 C.F.R. §§ 585.102, 585.210. Once a lease is sold, a lessee must submit a site assessment plan. 30 C.F.R. §§ 585.600, 585.605–613. If BOEM approves the site plan, the lessee has five years to conduct site-assessment activities to gather necessary data. 30 C.F.R. § 585.235(a)(1). The lessee must then prepare a proposal, such as for the development of a wind energy facility, and submit a construction and operations plan. 30 C.F.R. §§ 585.600, 585.620–629. Next, BOEM must prepare "an appropriate [National Environmental Policy Act (NEPA)] analysis." 30 C.F.R. § 585.628(b) (citing NEPA, 42 U.S.C. §§ 4321 to 4370m-12). The agency must review the construction and operations plan to ensure compliance with OCSLA and its regulations, and "approve, disapprove, or approve with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f). Then the project may commence operations.

After BOEM has granted the necessary approvals for leasing and development of a section of the Outer Continental Shelf, it may only order a lease suspension (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" or (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. If BOEM orders a suspension, it must issue a written order that "explain[s] the reasons for its issuance and describe[s] the effect of the suspension order on [the] lease." 30 C.F.R. § 585.418(c). A separate office within the DOI, the Bureau of Safety and Environmental Enforcement (BSEE),

3

may suspend an Outer Continental Shelf lease "[w]hen continued activities pose an imminent threat of serious or irreparable harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites structures, or objects of historical or archaeological significance." 30 C.F.R. § 285.417(a) (providing also that BSEE, like BOEM, may suspend a lease to "comply with judicial decrees"). Activities may not be conducted on the lease during the period of suspension, unless expressly authorized. 30 C.F.R. §§ 285.415(c), 585.415(c). Finally, OCSLA authorizes DOI to suspend or temporarily prohibit any operation or activity pursuant to a lease at the request of a lessee, or if there is "a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment." 43 U.S.C. 1334(a)(1).

## II.    FACTUAL BACKGROUND

### A.    State Energy Standards and Solicitation of Proposals

#### 1.  Rhode Island

Rhode Island is committed to transitioning away from fossil fuels and towards sustainable clean energy intended to offset the impacts of harmful greenhouse-gas emissions. The State is relying on Revolution Wind to achieve its policy aims in reducing greenhouse gas (GHG) emissions, mitigating the effects of climate change, and growing its economy.

Several state laws govern the need for increased renewable energy in the State. The 2021 Act on Climate sets decarbonization mandates, including requirements that greenhouse gas emissions are reduced to 45% percent below 1990 levels by 2030, 80% below 1990 levels by 2040, and that the State reaches net-zero emissions by 2050. *See* R.I. Gen. Laws § 42-6.2-9. The State of Rhode Island also participates in the Regional Greenhouse Gas Initiative. *See* R.I. Gen. Laws §§ 23-82-1 to 39-26-10. Rhode Island's Renewable Energy Standard (RI RES) requires that 100%

of Rhode Island's electricity demand is met by renewable energy by 2033, less than eight years from now. *See* R.I. Gen Laws § 39-26-4(a)(14).[2] And Rhode Island's Affordable Clean Energy Security Act (RI ACES), R.I. Gen. Laws § 39-31-1 *et seq.*, aims to advance the objectives of achieving a reliable, clean-energy future that is consistent with meeting regional greenhouse gas reduction goals at reasonable cost to ratepayers. R.I. Gen. Laws § 39-31-2.

On February 7, 2019, pursuant to the RI ACES, the Narragansett Electric Company, d/b/a National Grid, filed a proposed 20-year Power Purchase Agreement (PPA) between it and DWW Rev I, LLC, also known as the Revolution Wind offshore wind project, developed by Ørsted U.S. Offshore Wind (Ørsted). Kearns Decl., attached as Ex. 1, ¶¶ 10–12; Public Utilities Commission Docket #4929 (March 22, 2019), https://tinyurl.com/482kf8e2. The Narragansett Electric Company, in consultation with Rhode Island's Office of Energy Resources and Division of Public Utilities and Carriers, voluntarily selected the 400-megawatt (MW) project to pursue a long-term PPA under RI ACES. Kearns Decl. ¶¶ 10–12. The agreement between Rhode Island Energy and Revolution Wind includes commitments for a $40,000,000 investment in Rhode Island ports, including significant investments in the Port of Davisville which is owned by the quasi-state agency known as the Quonset Development Corporation, and $4,500,000 to fund workforce training and development initiatives to grow clean energy in the State. *See* Revolution-Wind.com, Ørsted and Eversource Establishing Regional Offshore Wind Foundation Component Manufacturing Facility at ProvPort in Rhode Island (April 2021), https://tinyurl.com/yp62nvc7; April 22, 2019 Press Release, Governor Announces $4.5 Million Investment by Ørsted,

---

[2] The RI RES seeks to facilitate "the development of new renewable energy resources to supply electricity to customers in Rhode Island with goals of stabilizing long-term energy prices, enhancing environmental quality, and creating jobs in Rhode Island in the renewable energy sector." R.I. Gen Laws § 39-26-3. It also requires obligated entities, including utility companies that sell at retail to Rhode Island end-use customers, to increase the percentage of their energy that comes from eligible renewable energy. This requires annual increases of 7-9.5% from 2026 to 2033. R.I. Gen Laws § 39-26-4.

Eversource to Grow Rhode Island Offshore Wind Workforce and Supply Chain, https://energy.ri.gov/press-releases/governor-announces-45-million-investment-orsted-eversource-grow-rhode-islands. Following full review, evidentiary hearings, and the issuance of testimony and/or advisory opinions from the Rhode Island Department of Environmental Management, Office of Energy Resources, Division of Public Utilities and Carriers, and the Commerce Corporation, the PPA between Rhode Island Energy and Ørsted was approved by the Rhode Island Public Utilities Commission on May 28, 2019. Kearns Decl. ¶ 12.

### 2. Connecticut

As part of a comprehensive State-wide policy, Connecticut has worked to shift reliance away from fossil fuels and towards renewable energy sources, including wind. The foundation for this policy is the State's Renewable Portfolio Standard (RPS), which has been in place in some form since 1998. Dykes Decl., attached as Ex. 2, ¶ 10. The RPS requires electric suppliers to obtain a specified percentage of the energy they sell or distribute to Connecticut customers from renewable sources through the purchase of Renewable Energy Certificates (RECs). Dykes Decl. ¶ 10. The total renewable output targets increase each year, and the RPS requires load serving entities to obtain at least 33% of the electricity they sell or distribute in Connecticut from renewable energy sources, such as wind, by January 1, 2030. *See* Conn. Gen. Stat. § 16-245a; Dykes Decl. ¶ 10. Connecticut's RPS and renewable energy goals are supported by a statutory scheme.

To achieve its sovereign interest in procuring renewable energy, Connecticut's legislature has enacted statutes encouraging the procurement of renewable energy and mandating reduction of GHG emissions. Most broadly, the legislature has mandated economy-wide GHG emissions targets, which state that GHG emissions must be 45% below 2001's GHG emissions level by 2030, 65% below 2001 levels by January 1, 2040, and, by January 1, 2050, at an economy-wide net-zero level, provided that GHG emissions are at least 80% below the 2001 level. *See* Conn. Gen. Stat. §

22a-200a; Dykes Decl. ¶ 11. To achieve these mandates, the Commissioner of the Department of Energy and Environmental Protection (Commissioner; CT DEEP), must prepare an Integrated Resources Plan (IRP) outlining the State's electric sector needs, including electric reliability and meeting the State's GHG reduction goals. *See* Conn. Gen. Stat. §§ 16a-3a; 16a-3e; Dykes Decl. ¶ 14. Likewise, the Commissioner must prepare a Comprehensive Energy Strategy, which incorporates the findings of the IRP and the GHG emissions goals set forth in § 22a-200a. *See* Conn. Gen. Stat. § 16a-3d; Dykes Decl. ¶ 12.

The Connecticut legislature has also provided CT DEEP with authority to procure new renewable energy resources, including offshore wind, for the State. In 2019, the Connecticut legislature passed an offshore wind act, codified in Conn. Gen. Stat. § 16a-3n, that created a process for CT DEEP to work with other Connecticut state officials to solicit competitive proposals for offshore wind projects. Dykes Decl. ¶ 13. This section also authorizes CT DEEP to direct the State's electric distribution companies to enter into long-term contracts with bidders meeting certain criteria, which CT DEEP has done. Dykes Decl. ¶ 13. CT DEEP also has similar procurement authority for additional renewable energy resources, including offshore wind, codified in Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m. Dykes Decl. ¶ 13.

In 2018 and 2019, using its authority under Conn. Gen. Stat. §§ 16a-3n and 16a-3m, CT DEEP selected 200 MW and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. Dykes Decl. ¶ 18. For each solicitation, CT DEEP spent about a year of staff time developing the solicitation documents, reviewing and evaluating bids, and developing materials justifying its selection decision in each solicitation before Connecticut's Public Utilities Regulatory Authority (PURA). Dykes Decl. ¶ 18. Each solicitation used significant staff time at CT DEEP and included CT DEEP's consultant hired to do electric sector modeling,

PURA, the Office of Consumer Counsel, and the electric distribution companies, which are all paid for by electric ratepayers. Dykes Decl. ¶ 18. Revolution Wind entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. Dykes Decl. ¶ 20. The resulting contracts were submitted to PURA for review and approval. Dykes Decl. ¶ 20. PURA approved those contracts in Docket Nos. 18-06-37 and 18-05-04. Dykes Decl. ¶ 20.

CT DEEP is currently working on a new IRP, as required by statute. Dykes Decl. ¶ 14 The last one, which was published in October 2021, included electric sector modelling, a detailed reliability analysis, and recommendations on actions, including future procurements of renewable energy, to achieve the 2040 zero-carbon electricity supply target. Dykes Decl. ¶ 14. It concluded that, to achieve Connecticut's target of a 100% GHG emissions-free electricity supply by 2040, significant additions of new zero-carbon generation will be required. *See* Dykes Decl. ¶ 15; State of Connecticut, Integrated Resource Planning, https://portal.ct.gov/deep/energy/integrated-resource-planning/integrated-resource-planning. The 2021 IRP relied on the fact that Revolution Wind would come online and contribute to the 2040 zero-carbon electricity supply target. Dykes Decl. ¶ 25. If Revolution Wind had not been available, CT DEEP would have accelerated procurement efforts for other zero-carbon energy resources. Dykes Decl. ¶ 25.

B.      Federal Permitting of Revolution Wind

The States, Ørsted, and the federal government have been working together for more than a decade to create a wind energy facility off Rhode Island's shore. Dykes Decl. ¶¶ 18, 23, 45, 48; Kearns Decl. ¶¶ 4, 13–14. In 2009, BOEM established an intergovernmental task force to coordinate the leasing process for this offshore wind project. Record of Decision at 2, Compl. ¶ 55 n.2. In 2013, Deepwater Wind New England, LLC—which Ørsted later acquired—won a BOEM

auction for the lease area off the Rhode Island Shore (OCS-A 0486). *See* Rice Decl., attached as Ex. 3, Ex. A (Gearon Decl.) ¶ 8. Later that year, BOEM signed and executed Deepwater Wind's commercial wind energy lease. *See* Gearon Decl. ¶¶ 8, 8 n.6. The lease states: "The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of [OCSLA] and applicable regulations." BOEM, *Commercial Lease for Renewable Energy Development OCS-A 0486* (Sep. 9, 2013), https://tinyurl.com/22bwrt75. The lease further states that BOEM may order operations to cease "[i]f the Lessee fails to comply with (1) any of the applicable provisions of [OCSLA] or [its] regulations, (2) the approved [Site Assessment Plan] or [Construction and Operations Plan], or (3) the terms of this lease." *Id*. at 3–4.

In 2020, Deepwater Wind submitted a proposed Construction and Operations Plan for the Project. *See* Revolution Wind Farm Construction and Operations Plan, https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan. Rhode Island's Coastal Resources Management Council (CRMC) and the Rhode Island Department of Environmental Management (RIDEM) then collaborated with BOEM to produce an Environmental Impact Statement. *See* BOEM, Revolution Wind Farm and Revolution Wind Cable Project Final Environmental Impact Statement (July 2023), https://tinyurl.com/3jyjayk4. In 2022, BOEM published a Draft Environmental Impact Statement, and accepted public comment on it. Gearon Decl. ¶¶ 11–13. In 2023, BOEM published the Final Environmental Impact Statement, consisting of 2,800-plus pages, after spending almost two-and-a-half years analyzing Revolution Wind's environmental impact. BOEM, Revolution Wind Farm and Revolution Wind Cable Project Final Environmental Impact Statement (July 2023).

9

In August 2023, BOEM, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and the U.S. Army Corps of Engineers (USACE) issued a joint Record of Decision for the Project, approving construction of up to 100 wind turbines within the leased area. BOEM, USACE, NMFS, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023) at 1, 8, https://tinyurl.com/49fsdw6r (Record of Decision). The Record of Decision concluded that approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the [Outer Continental Shelf] are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA." Record of Decision at B-26. Likewise, BOEM found that approving the Project with selected mitigation measures "is consistent with the duties required under subsection 8(p)(4) of OCSLA" because it "balances the orderly development of [Outer Continental Shelf] renewable energy with the prevention of interference with other uses of the [Outer Continental Shelf] and the protection of the human, marine, and coastal environments." Record of Decision at 25.

In reaching that conclusion, BOEM considered all twelve factors required under 43 U.S.C. § 1337(p)(4), including national security and interference with other reasonable uses of the Outer Continental Shelf. Neither, BOEM found, would be undermined by Revolution Wind. Record of Decision at B-2.

First, BOEM found Revolution Wind would not undermine national security, and that any national security impacts "would be negligible and avoidable." Record of Decision at B-15-16. BOEM consulted with the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, North American Aerospace Defense Command (NORAD), USACE, and the Federal Aviation Administration (FAA) before approving the Construction and Operation Plan. Record of Decision

10

at B-15. To mitigate any national security concerns, BOEM and the Department of Defense conditioned their approval on Ørsted agreeing to "specific mitigation measures" for the Project. Record of Decision at B-16.

Second, BOEM found that Revolution Wind would "not unreasonably interfere with other uses of the [Outer Continental Shelf]." Record of Decision at B-18. After assessing nearby ports and shipping lanes, BOEM concluded that primary vessel traffic is outside the Project's area, Record of Decision at B-19, that fishing vessels can safely navigate through the lease area, and that any impact on aviation would be minimal, Record of Decision at B-19, B-20. BOEM also adopted mitigation measures to minimize Revolution Wind's marginal impacts. Record of Decision at B-19, B-20. With these mitigation measures in place, BOEM approved Revolution Wind's Construction and Operations Plan in November 2023. Gearon Decl. ¶ 14.

C.      Rhode Island Permitting and Approval of Revolution Wind

The Revolution Wind Project additionally had to secure all necessary state permits and licenses required for construction and operation with respect to its facility. This included assessments and certifications from various state agencies.

In February 2023, Rhode Island's Coastal Resources Management Council (CRMC) approved Revolution Wind's application and found that the Revolution Wind Project "does not have a reasonable probability of causing a detrimental impact upon the coastal resources of the State of Rhode Island." CRMC, Decision on Revolution Wind Petition, Dkt. No. 2021-07-005 (February 2023), https://tinyurl.com/4m6825zz. In May 2023, CRMC completed its Coastal Zone Management Act federal consistency review and issued a concurrence, finding the Revolution Wind project is consistent and complies with the enforceable policies of Rhode Island's approved management program. Rhode Island Coastal Resources Management Council, Federal Consistency    Review    of    the    Revolution    Wind    Project    (May    12,    2023),

11

https://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.

Revolution Wind additionally applied for and received all required RIDEM water quality certificates as well as licensing by the Rhode Island Energy Facility Siting Board. *See* R.I. Gen. Laws § 42-98-4.

After receiving all the necessary permitting, Ørsted and another developer began developing the Project. Kearns Decl. ¶¶ 12–13. Construction began in 2023 and is now approximately 80% complete. Dykes Decl. ¶¶ 22, 47; Kearns Decl. ¶ 15. The Project is expected to reach commercial operation in 2026. Dykes Decl. ¶ 22; Kearns Decl. ¶ 13.

D.      The Wind Memorandum and Stop Work Order

On January 20, 2025, President Trump issued a memorandum that halted all federal approvals necessary for the development of offshore and onshore wind energy. *See Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8363 (Jan. 29, 2025) (Wind Memo). Section 1 of the Wind Memo prohibits "consideration of any area in the Outer Continental Shelf for any new or renewed wind energy leasing." *Id.* It notes, however, that "[n]othing in this withdrawal affects rights under existing leases in the withdrawn areas." *Id.*

Section 2 of the Wind Memo states that relevant agency heads "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices." Wind Memo at 8364.Without citing any evidence, the Wind Memo asserts that this assessment is needed "[i]n light of various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm . . . and in light of potential inadequacies in various

12

environmental reviews required by the National Environmental Policy Act to lease or permit wind projects." Wind Memo at 8363-64.

On August 22, 2025, BOEM's acting director, Matthew Giacona, issued a Stop Work Order to Ørsted. The Order directed it "to halt all ongoing activities related to the Revolution Wind Project on the [Outer Continental Shelf] to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to [the Wind Memo]." BOEM Acting Director Giacona, Letter to Rob Keiser, Head of Asset Management at Ørsted North America Inc. (Aug. 22, 2025) (Stop Work Order or Order), Compl. Ex. A. The Order states:

> BOEM is acting to ensure that all activities authorized under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, and the implementing regulations at 30 C.F.R. Part 585 are carried out in a manner that provides for protection of the environment, among other requirements. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a). In particular, BOEM is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of OCSLA. *Id*. The BOEM Director is taking this action to ensure compliance with the requirements of the Part 585 regulations and applicable law.

Upon receiving the Stop Work Order, Ørsted immediately suspended construction activities for the Revolution Wind Project. Rice Decl., Ex. B (Murphy Decl.) ¶ 15; Kearns Decl. ¶ 24.

E.      Harms to Various Stakeholders

The Stop Work Order is causing, and will continue to cause, significant harms to the States, their residents, and participants in the wind industry.

1.      The Stop Work Order Threatens the Viability of the Revolution Wind Project.

When the Stop Work Order was issued, the topside of the second offshore substation, weighing 3,000 pounds, was perched atop a specialized heavy transport vessel, the White Marlin. Murphy Decl. ¶ 13. The White Marlin, a specialized and limited-availability vessel upon which this large piece of crucial equipment now sits idle in the Atlantic Ocean, has a latest-availability

13

date of December 15, 2025. Murphy Decl. ¶ 22. "There is currently no solution" to offload, store, or otherwise preserve the topside of the second offshore substation because of worldwide vessel availability, the specialized nature of the equipment and its storage needs, and the need to either identify or construct a lift capable of removing the equipment from the White Marlin. Murphy Decl. ¶¶ 22, 21.

The fate of the second offshore substation topside is only an example of the complexity of halting a large-scale wind farm construction project midstream. Construction on the Revolution Wind project was approximately 80% complete when the Stop Work Order was issued, with all of the planned underwater foundations for the turbines completed and 70% of the planned wind turbine generators completely constructed. Murphy Decl. ¶ 10. Prior to the Stop Work Order, all offshore physical construction was planned to be completed before the end of 2025. Murphy Decl. ¶ 14. Because of weather conditions in the construction area, that commitment actually means that most construction work would need to be completed in September and October. Murphy Decl. ¶ 29. Missing project milestones also does not result in a one-for-one delay because of vessel availability—other wind projects throughout the world compete for these specialized vessels and Revolution Wind has only secured them for the work planned to be completed by the end of December. Murphy Decl. ¶¶ 31–35. Certain vessels, like those required to lay cable, "are typically booked over a year in advance," Murphy Decl. ¶ 34, and therefore any significant duration to the Stop Work Order such as that as would result awaiting a final judgment on the merits in this case, will cause lengthy, unacceptable delay. Revolution Wind has also explained that these components either cannot be reused or have minimal value for reuse. Murphy Decl. ¶ 37. While abandonment by Revolution Wind remains a possibility that would wreak havoc on the States' policies

14

surrounding wind energy, even the delay that is certain to occur absent judicial intervention will, as explained below, lead to irreparable harm.

2.    The Stop Work Order Harms the States' Energy Interests.

Connecticut and Rhode Island have a strong interest in the timely completion of the Revolution Wind Project. The States selected Revolution Wind to provide electricity and RECs to help meet their energy needs and RPS and RI RES requirements. Dykes Decl. ¶¶ 17–21; Kearns Decl. ¶¶ 10–12. The States expected Revolution Wind to begin delivering power and RECs to the New England regional grid, which supplies power to Connecticut and Rhode Island, in the second half of 2026. Dykes Decl. ¶ 22; Kearns Decl. ¶ 13.

Revolution Wind was expected to produce enough power to meet about 2.5% of New England's electricity load, which includes 5% of Connecticut's electric distribution company load. Dykes Decl. ¶¶ 50, 53; Kearns Decl. ¶¶ 29–30. Connecticut, Rhode Island, and New England's independent regional grid operator, ISO-NE, have been counting on Revolution Wind to come online to contribute to grid reliability. Dykes Decl. ¶¶ 50–52; Kearns Decl. ¶¶ 29–30. Analysis by ISO-NE shows the importance of bringing offshore wind online for regional reliability, particularly during the winter months when the New England grid faces its greatest reliability challenges. Dykes Decl. ¶¶ 51–52. Offshore wind projects are particularly well-suited to addressing this need because, while they provide energy throughout the year, they perform especially well in the winter. Dykes Decl. ¶ 52.

On August 25, 2025, in response to the Stop Work Order, ISO-NE warned that delaying the Revolution Wind project would "increase risks to reliability," including potential "near-term impacts to reliability in the summer and winter peak periods," and "adversely affect New England's economy and industrial growth." ISO-NE, Statement on Revolution Wind Stop Work Order (August 25, 2025), https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-

15

wind-stop-work-order. ISO-NE also stated that "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future." *Id.*

Electricity consumers, including the States themselves, will pay more for their electricity if the Revolution Wind project cannot proceed as planned. Revolution Wind will lower electricity costs for the States by bringing online more zero-marginal cost energy. Anticipated savings from the contract to Connecticut ratepayers are hundreds of millions of dollars over the contract. Dykes Decl. ¶ 54. The Revolution Wind project will result in similar savings to Rhode Island ratepayers.

The loss of improvements in grid reliability may also carry financial implications for ratepayers because, as ISO-NE has warned, the loss or delay of Revolution Wind "will increase risks to reliability" in the region. ISO-NE, Statement on Revolution Wind Stop Work Order. The longer the indefinite delay in the construction of Revolution Wind persists, the longer the timeframe over which the States will need to make up for that loss of energy. Delays additionally risk less favorable contracts for replacement energy and ultimate cost increases for ratepayers.

3.  The Stop Work Order Harms Many Economic and Contractual Interests.

The States and other stakeholders have made significant commitments and developed expectations based on the Revolution Wind project. To support this and other offshore wind projects, Connecticut has invested in facilities, including by redeveloping the Connecticut State Pier Terminal in New London. Dykes Decl. ¶ 36. The State has spent over $200,000,000 to convert that site into a world-class heavy-lift maritime facility and hub for offshore wind, and it is one of only three marshaling facilities on the East Coast that are assembling offshore wind turbines for deployment and was the first one with open ocean access. Dykes Decl. ¶ 36. The State Pier

Terminal is leased to Ørsted, which is using it to construct Revolution Wind, and the financial impact of the indefinite halt on Ørsted will ultimately affect the Connecticut Port Authority's lease agreement. Dykes Decl. ¶¶ 36–38; *see* Dykes Decl. ¶¶ 58–60.

In Rhode Island, the Revolution Wind Project and wind industry have boosted port activity; over 300 offshore wind-specific vessel calls to the Port of Providence in 2024 have highlighted Rhode Island's role as a logistics hub. Kearns Decl. ¶¶ 18–19. In parallel, the State has cultivated a growing cluster of offshore wind companies at the Cambridge Innovation Center in Providence, which serves as a soft-landing destination for the largely European supply chain entering the U.S. market. Kearns Decl. ¶¶ 19–20. Ørsted signed the first-ever U.S. offshore wind helicopter agreement for new crew helicopters, including a $1,800,000 investment in Quonset State Airport where the helicopters are based. August 22, 2023 Press Release, RI.gov, Revolution Wind Receives Federal Record of Decision, https://governor.ri.gov/press-releases/revolution-wind-receives-federal-record-decision. Rhode Island shipyards built five crew vessels to support Revolution Wind and other installations during and after its construction. January 27, 2022 Ørsted press release, https://us.orsted.com/news-archive/2022/01/rhode-island-shipyards-to-build-five-new-offshore-wind-crew-vessels. [3] Together, these investments have catalyzed infrastructure upgrades at ProvPort and Quonset, secured new supply chain commitments, and positioned Rhode Island as a leader in attracting global ocean economy companies. Kearns Decl. ¶¶ 18–20, Cox Decl., attached as Ex. 4, ¶¶ 6–7. The project, once completed, is expected to generate an $8,120,000 annual increase in Rhode Island's GDP. Public Utilities Commission Docket #4929 (March 22, 2019), https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-RICC-AdvisoryOpinion_3-22-19.pdf.

---

[3] January 27, 2022 Ørsted press release, https://us.orsted.com/news-archive/2022/01/rhode-island-shipyards-to-build-five-new-offshore-wind-crew-vessels.

The prospects of the local workforce are also tied to the Project. The Revolution Wind Project supports approximately 1,200 jobs in Connecticut and Rhode Island, including more than 100 jobs that are tied directly to staging and assembly for offshore wind at the State Pier Terminal. Dykes Decl. ¶ 39. Investments have also been made, by the States and others, to support this segment of the workforce. For instance, the Community College of Rhode Island has already provided nearly 200 union workers training anticipating this offshore wind project. Edward Fitzpatrick, *Revolution Wind halt concerns R.I. college leaders*, Boston Globe (Aug. 28, 2025, at 5:55 ET), https://www.bostonglobe.com/2025/08/28/metro/ri-college-leaders-oppose-revolution-wind-halt. An indefinite halt to the Project will impact the employment of the 1,200 people living and working in Connecticut and Rhode Island. If those people become unemployed, the States will experience negative financial and social repercussions. Dykes Decl. ¶ 57. The indefinite halt has immediate impacts on the States' interest in this sector of the economy. Cox Decl. ¶¶ 8–10. The Stop Work Order is also likely to undermine investor confidence and set a chilling precedent for future projects. Cox Decl. ¶¶ 11–17. This type of shock to the industry hurts the States' investments to support this industry.

> 4. The Stop Work Order Imperils Compliance with State Mandates and the States' Ability to Meet Environmental Goals.

The Stop Work Order undermines the States' ability to procure energy from offshore wind generation as needed to meet the States' energy and environmental requirements and goals.

As described above, Connecticut mandates that electric distribution companies must demonstrate that a percentage of their output or services is generated by renewable energy sources, and the State also has mandatory emission reduction targets. *See supra* Section II.A.2. Rhode Island, too, has laws that set decarbonization requirements, mandate statewide greenhouse gas emissions reach certain minimum levels, and require increases in renewable energy each year. *See*

18

*supra* Section II.A.1. The State had anticipated that the Revolution Wind project would reduce its annual greenhouse gas emissions by approximately 102,000 tons of CO2 per year, a ten percent reduction for the Rhode Island Electric Power Consumption sector. Rhode Island Division of Public Utilities and Carriers Docket 4929, Brennan and DiDomenico Test. at 32 of 43 (February 2019), https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-NGrid-Brennan-DeDomenica%282-7-19%29.pdf.

The indefinite halt to Revolution Wind endangers the States' ability to comply with these legal requirements. For example, Connecticut's 2021 Integrated Resources Plan, which is a statutorily mandated review of the State's energy outlook, see Conn. Gen. Stat. § 16a-3a, lists the Revolution Wind Project as a significant contributor to achieving the State's RPS and greenhouse gas reduction goals. Dykes Decl. ¶¶ 14, 25. Revolution Wind has been so thoroughly integrated into the State's planning concerning RPS and greenhouse gas emissions, that the State has experienced immediate harm by the prospect that Revolution Wind may not be timely completed due to the immediate halt of operations to the Project. Dykes Decl. ¶¶ 62, 64. Similarly, Rhode Island is relying on the 400 MW from Revolution Wind and the long-term negotiated pricing to cost-effectively comply with the requirements under the RI RES and meet its greenhouse gas reduction mandates. Kearns Decl. ¶¶ 33–34.

There is not an immediate and obvious replacement for the energy that Revolution Wind was going to supply to the States. *See* Dykes Decl. ¶ 62. Revolution Wind was chosen for a reason—it was the best way to reduce costs for ratepayers, comply with state mandates, and ensure a long-term stable energy source. *See* Dykes Decl. ¶¶ 45, 53–54, 64. The multi-year process that the States engaged in before selecting Revolution Wind cannot be recreated in a timely fashion. *See* Dykes Decl. ¶ 62.

19

The States face immediate uncertainty in the future composition of its energy consumption resulting from the indefinite halt of Revolution Wind. Revolution Wind has been calculated into meeting the States' energy needs, GHG reduction goals and other renewable energy objectives for the next several years. Suddenly removing it through an indefinite halt to the Project leaves the State's energy future uncertain.

## ARGUMENT

When considering a request for a preliminary injunction, the "district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigr. And Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "While all four factors are relevant, likelihood of success is the 'main bearing wall' of the preliminary injunction framework." *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

All of these factors weigh heavily in the States' favor. The States are likely to succeed on the merits of their APA claims because the Stop Work Order is an arbitrary and capricious agency action and contravenes the statute and regulations defining the limits of BOEM's authority to pause activity or operations under an existing lease. Moreover, because the Stop Work Order violates OCSLA and its implementing regulations, the challenged action is ultra vires and Plaintiff States

20

are also entitled to relief under OCSLA. Finally, the Stop Work Order presents imminent and irreparable harm so that the equities and public interest also strongly favor preliminary relief.

## III.     PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS

The States are likely to succeed on the merits for several reasons, each independently sufficient to invalidate implementation of the Stop Work Order. The Stop Work Order is arbitrary and capricious in multiple respects, exceeds Agency Defendants' authority under the laws governing federal approvals of wind energy, and is ultra vires.

A.     The Stop Work Order Is a Final Agency Action that Violates the Administrative Procedure Act.

"Final agency actions" are subject to review under the Administrative Procedure Act (APA). 5 U.S.C. § 704. An action is "final" if it (1) concludes an agency's decision-making process and (2) determines rights or obligations or imposes legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997). Agency action can be final for purposes of APA review even if it is temporary or subject to reconsideration. *See, e.g.*, *NRDC v. Wheeler*, 955 F.3d 68, 79–80 (D.C. Cir. 2020) (noting that "if an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions even if they impose substantial obligations on regulated parties over a considerable period of time" and stating that "as long as an agency has completed its decisionmaking on a challenged rule— even one interim in nature—the rule satisfies the first prong of the finality test").

Here, the Stop Work Order plainly determines "rights and obligations" and has "legal consequences," *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)), and thus is a final agency action subject to APA review. The Order aims to immediately halt construction on Revolution Wind, and it has done so. The Agency Defendants are not mid-debate whether to pause the Project—they have

21

directed the halt through the Order. There are also legal consequences that follow from the Stop Work Order, as BOEM has threatened to "take additional corrective action" if Ørsted continues work on Revolution Wind, citing the regulation that gives it authority to impose civil penalties on noncomplying companies. The Order is thus a final agency action subject to this Court's review, and it should be set aside both because it is arbitrary and capricious and because it is not in accordance with the law.

1.  The Stop Work Order Is Arbitrary and Capricious.

a.  Agency Defendants Offer No Reasoned Basis for Halting Activities Related to the Revolution Wind Project.

The APA requires agencies to engage in "reasoned decisionmaking," *Michigan v. U.S. Env't Prot. Agency*, 576 U.S. 743, 750 (2015), and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "[C]onclusory statements will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). Moreover, "[a] command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement." *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–295 (W.D. La. 2022).

Here, Agency Defendants have provided no reasoned basis to indefinitely halt construction of the fully-permitted Revolution Wind Project, and the conclusory statements in the Stop Work Order are not connected to any facts or evidence. BOEM Acting Director Giacona said in the Stop Work Order that it is intended to "ensure that all activities" are "carried out in a manner that provides for protection of the environment, among other requirements," and that it "is seeking to

22

address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of OCSLA." Stop Work Order at 1. The Stop Work Order, he added, was intended to "ensure compliance with the requirements of Part 585 regulations and applicable law." *Id.*

On its face, the Stop Work Order does not reflect the reasoned decision-making the APA requires. The Order cites the applicable regulatory framework and two factors BOEM must consider when permitting an offshore project like Revolution Wind—national security and interference with other uses of the Outer Continental Shelf. *See* 43 U.S.C. § 1337(p)(4)(F), (I). But these considerations were already undertaken when existing permits were granted, and there is no new or existing evidence suggesting that the Revolution Wind Project imperils national security or interferes with other Outer Continental Shelf uses. Without such factual basis, there is no way to decipher from the Stop Work Order "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Even assuming there were legitimate concerns about national security or interference, the Agency Defendants did not bother even trying to explain how those concerns justify indefinitely halting construction of a multi-billion dollar, fully permitted project.[4] The Court should "not defer to the[se] . . . conclusory or unsupported suppositions" made in the Stop Work Order. *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *see also Louisiana*, 622 F. Supp. 3d at 295 (finding DOI's stop work order for offshore drilling arbitrary and capricious "[b]ecause no rational explanation was given" for it).

---

[4] To the extent Defendants attempt to rely on the Wind Memo, 90 Fed. Reg. 8363, also referenced in the Stop Work Order, they fare no better, as it, too, lacks any reasoning or support. The Wind Memo alleges "various alleged legal deficiencies" in the leasing and permitting and claims "potential inadequacies in various [NEPA] reviews," but fails to identify even a single such instance, much less a factual basis. *See id*. Similarly, the Wind Memo alleges that wind-energy development risks "grave harm" including to navigational, transportation, national security, and commercial interests and marine mammals, *id.*, but fails to cite any specific risk.

23

The States are thus likely to succeed in demonstrating that Agency Defendants' indefinite halt on construction of the Revolution Wind Project, untethered to any evidence or factual basis, is arbitrary and capricious.

>    b.    Agency Defendants Fail to Explain Their Abrupt Reversal of Their Prior Position.

The Stop Work Order is also arbitrary and capricious because it constitutes an unexplained reversal of the federal government's prior finding that the Revolution Wind Project satisfies OCSLA's requirements. When an agency changes its existing position, it must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quotation marks omitted). "Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (cleaned up).

Here, Agency Defendants entirely fail to explain their abrupt shift. BOEM and other government agencies spent nine years reviewing Revolution Wind, which resulted in the joint Record of Decision and a 2,800-page Final Environmental Impact Statement approving the Project. Unlike the exhaustive administrative record backing Revolution Wind's permits, the Stop Work Order fails to provide any "satisfactory explanation for its action." *State Farm*, 463 U.S. at 43 (1983). The Stop Work Order contradicts not just the Agency Defendants' past approval, but also their more recent assertions in the ongoing litigation with environmental advocacy groups that Revolution Wind complies with the Endangered Species Act and Clean Water Act. *See Green*

24

*Oceans, et al. v. United States Dept. of the Interior*, No. 1:24-cv-00141-RCL (D.D.C); *see Lighthouse Foundation v. Haaland, et al.*, No. 1:23-cv-03515-RCL (D.D.C); *Pres. Society of Newport County v. Haaland, et al.*, No. 1:23-cv-03513-RCL (D.D.C.). The contradictions extend to other federal agencies and actions too. The GAO recently found no programmatic or implementation problems in BOEM's environmental analyses of offshore wind projects. *See* U.S. Gov't Accountability Office, GAO-25-106998, *Offshore Wind Energy, Actions Needed to Address Gaps in Interior's Oversight of Development* at 52 (GAO Report) (Apr. 2025) at 52, https://www.gao.gov/assets/gao-25-106998.pdf. In his Energy Emergency Order, President Trump declared that the United States is facing an "energy emergency," which prompted DOI to begin expediting fossil fuel projects. None of these actions square with halting Revolution Wind. *See Encino Motorcars*, 579 U.S. at 222 (agency action arbitrary and capricious when it reflects "unexplained inconsistenc[ies]" with other actions).

This failure to acknowledge, much less address, Agency Defendants' change in position—as well as their failure to grapple with their own prior findings following comprehensive reviews—renders their halt on wind-energy development arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 221 (although agencies remain "free to change their existing policies," they still must "provide a reasoned explanation for the change"); *accord Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 307 (D. Mass. 2025) (finding likelihood of success on claim of arbitrary and capricious action where agency "failed to provide even the most basic level of 'reasoning,' let alone recognize or justify the disregarded facts that underlay its existing policy").

      c.    Agency Defendants Fail to Account for Serious Reliance Interests.

Agencies also must provide "more detailed justification" for a change in policy when their prior policy "engendered serious reliance interests." *Housatonic River Initiative v. U.S. Env't. Prot. Agency, New England Region*, 75 F.4th 248, 270 (1st Cir. 2023) (quotation marks omitted). A

25

"change that does not take account of legitimate reliance on prior interpretation may be arbitrary [and] capricious." *Smiley*, 517 U.S. at 742 (cleaned up). Here, the States and Ørsted have invested in the leasing and permitting of Revolution Wind for nearly a decade and have developed significant reliance interests in the project—interests that the Agency Defendants did not consider in issuing the Stop Work Order.

The States and other stakeholders in the Revolution Wind Project have relied on the Agency Defendants' approvals for Revolution Wind in making policy and financial decisions, including whether to pursue other wind-energy or alternative renewable generation projects. The States are depending on Revolution Wind to help meet their statutorily required emission-reduction targets and have allocated significant agency resources to permitting and contracting related to existing wind-energy projects or with transmission projects intended to serve wind energy. Additionally, the States have invested significant state financial resources in industries and Project components associated with building out Revolution Wind. Those financial resources include Connecticut's $210,000,000 investment in upgrading the Connecticut Port Authority's State Pier Terminal in the Port of New London. In Rhode Island, the public-private partnership includes infrastructure at ProvPort and Quonset Point, and investment in job training through Rhode Island state educational institutions. Agency Defendants' Stop Work Order could "necessitate systemic" or at least "significant change[s]" to States' approach for achieving their climate goals, diversifying their energy portfolios, and supporting their growing energy needs. *Encino Motorcars*, 579 U.S. at 222.

Prior to selecting this course of action, Agency Defendants should have assessed the degree to which the States and other beneficiaries would be detrimentally affected by the sudden halt of construction. *Dep't of Homeland Sec. v. Regents of the Univ. Of Cal.*, 591 U.S. 1, 33 (2020). In

26

addition, they should have weighed the purported benefits of the halt of construction against the many costs, as described above. *See Michigan*, 576 U.S. at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").

But Agency Defendants neither considered the reliance interests, nor weighed any purported benefits against the costs before issuing their Order. *Regents*, 591 U.S. at 33 ("[B]ecause DHS was not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.") (cleaned up). The States are likely to succeed in demonstrating that this failure, too, renders the halt of construction on the Revolution Wind Project arbitrary and capricious. *See Rhode Island v. Trump*, 778 F. Supp. 3d 394, 425 (D. Mass. 2025) (finding agencies' failure to consider states' reliance interest on library, museum, and minority business funding prior to grant terminations and layoffs arbitrary and capricious); *Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271, at \*19 (D. Mass. Apr. 18, 2025) (plaintiffs likely to succeed on arbitrary and capricious claim where "State Department jettisoned its practice of more than thirty years with no explanation of the facts on which it premised its new determination and no consideration of the reliance interests in its prior policy.").

### 2. Agency Defendants' Halt on Wind-Energy Development Is Contrary to Law and Ultra Vires.

Agency Defendants "are creatures of statute," *Nat'l Fed. of Indep. Bus. v. Dep't of Lab, OSHA*, 595 U.S. 109, 117 (2022), and "literally have no power to act except to the extent Congress has authorized," *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 126 (cleaned up); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). The APA enforces this limit on agencies' power by serving "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*

27

*Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt*, 338 U.S. 632, 644 (1950)). Thus, under the APA, a court "shall . . . hold unlawful and set aside" agency action found to be "not in accordance with law," as well as agency action that is *ultra vires*, meaning "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C); *Nat'l Council of Nonprofits*, 775 F. Supp. at 126 ("If an agency exceeds that power [authorized by Congress], the court must set aside its action . . . .").

Agency action is "not in accordance with law" if it is contrary to statutory or regulatory mandates. *See*, *e.g.*, *Nat'l Env't Dev. Assn's Clean Air Project v. U.S. Env't Prot. Agency*, 752 F.3d 999, 1003 (D.C. Cir. 2014) (challenged agency action contrary to law because it was "plainly contrary to [the agency's] own regulations"); *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 291 (1st Cir. 1995) (agency actions "inconsistent with the plain terms of . . . enabling statute"); *see also U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978) ("Although it is within the power of the agency to amend or repeal its own regulations, the agency is not free to ignore or violate its regulations while they remain in effect."). An agency also cannot act ultra vires, and a court therefore "must exercise [its] independent judgment" to ensure "the agency has engaged in 'reasoned decisionmaking'" within the bounds of its authority. *Am. Pub. Health Ass'n*, 2025 WL 1822487, at *20 (quoting *Loper Bright*, 603 U.S. at 395, 412).

BOEM's Stop Work Order indicates that the agency issued the Order "to allow time for [the agency] to address concerns that have arisen," which allegedly include "concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." Stop Work

28

Order at 1. BOEM does not, however, have the power to suspend a lease for those reasons, either under the governing statute or its implementing regulations.

The governing statute indicates that, in the absence of a request from the lessee DOI is only permitted to suspend or temporarily prohibit activities or operations under a lease if there is "a threat of serious, irreparable, or immediate harm or damage." 43 U.S.C. § 1334(a)(1). Here, the Stop Work Order makes no finding of any such threat and instead speaks only of unsupported "concerns." Stop Work Order at 1.

Moreover, as described in Section I, the relevant regulations distributed authority to pause ongoing activities or operations between different agencies, BOEM and BSEE, specifying the circumstances under which each is able to suspend a lease. Pursuant to those regulations BOEM is only authorized to suspend a lease in two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" and (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. If BOEM orders a suspension, it must issue a written order that "will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease." 30 C.F.R. § 585.418(c).

No part of the Stop Work Order indicates that the conditions necessary for BOEM to issue a suspension order were present. There is no "judicial decree" in place that would justify a stop-work directive. *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 160–61 (D.D.C. 2022) (holding that "[t]he plain text of 30 C.F.R. § 585.417(a)[ ] suggests" the subsection confers no "regulatory discretion to suspend leases and lease operations" absent a court order), *vacated as moot on other grounds*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). And, although 30 C.F.R. § 585.417(a)(2) permits BOEM to suspend a lease where "necessary for reasons of national security or defense," that language indicates that such action is only permitted once the

29

agency has ***already determined*** that a suspension is necessary—it does not in any way suggest that the agency can suspend a lease while it is merely considering whether such a necessity might exist. 30 C.F.R. § 585.417 also does not allow BOEM to suspend a lease for the other reasons cited in the Stop Work Order: no part of that regulation empowers BOEM to suspend leases "to address concerns related to . . . prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." Stop Work Order at 1. BOEM's Stop Work Order is thus "not in accordance with law" and exceeds the agency's authority.[5]

B.    The Suspension Violates OCSLA.

When the government fails to abide by OCSLA, "any person having a valid legal interest which is or may be adversely affected may commence a civil action . . . to compel compliance with this subchapter against . . . the United States." 43 U.S.C. § 1349(a)(1); *see also* 43 U.S.C. § 1331(d) ("The term 'person' includes . . . a State."). Such an action may not be commenced fewer than 60 days after plaintiff serves notice of the alleged violation on "the Secretary and any other appropriate Federal official"—unless "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff," in which case notice to the government is sufficient and OCSLA waives the 60-day notice period. 43 U.S.C. § 1349(a)(2)–(3).

Here, as detailed *supra* at Sections I.E and IV, the Plaintiff States have suffered immediate harms as a result of the Stop Work Order, including to the States' economic interests, grid

---

[5] The remaining regulatory provisions cited in the Stop Work Order likewise do not provide BOEM with authority to suspend offshore lease operations. 30 C.F.R. § 585.102 (setting forth BOEM's responsibilities when administering OCSLA); 30 C.F.R. § 585.106 (establishing procedures for notices of noncompliance); 30 C.F.R. § 585.118 (laying out the appeals process for "a final decision issued by BOEM under" 30 C.F.R. Part 585). BOEM may order a unilateral suspension of Revolution Wind's lease operations "[w]hen the suspension is necessary for reasons of national security or defense," 30 C.F.R. § 585.417(b)—it may not do so pending an ambiguous "necessary review" or generally "to ensure compliance with the requirements of the [30 C.F.R.] Part 585 regulations and applicable law," Stop Work Order at 1.

reliability, and sustainability initiatives. The immediate and significant impact of BOEM's stop-work order on the Plaintiff States plainly triggers waiver of the 60-day notice period under OCSLA. *Compare Chevron, U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 64–65 (D.D.C. 2002) (holding that a FERC order directing disclosure of "the plaintiffs' commercially sensitive information within five days . . . certainly would detrimentally affect the plaintiffs' legal interest"), *with Fisheries Survival Fund v. Jewell*, No. 16-CV-2409, 2018 WL 4705795, at *10–11 (D.D.C. Sep. 30, 2018) (holding that a lease approval under OCSLA does not waive the 60-day notice period where "the lease has no *immediate* effect" and "[n]othing in the lease authorizes [lessee] to exclude others from the leased area or condition access" until additional permits are secured) (emphasis added). Because Plaintiff States served the appropriate government officials with notice of BOEM's OCSLA violation prior to commencing suit, Rice Decl., Ex. C (Notice of Intent), this action is timely. *See* 43 U.S.C. § 1349(a)(3).

As discussed in the preceding section, BOEM violated OCSLA in issuing the Stop Work Order and the States are therefore likely to show that they are entitled to an order compelling compliance with the law.

## IV.    PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

The Court should enter a preliminary injunction because Plaintiff States are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22 (emphasis in original). Injuries of many types are

31

irreparable, and district courts "have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (citations omitted).

A.    The States Are Likely to Suffer Harms Imminently.

Without relief before trial, harm to the Plaintiff States is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Revolution Wind was due to start supplying energy to the grid in 2026. Dykes Decl. ¶ 22. To meet this timeline, a carefully orchestrated dance of seldom-available, specialized vessels has been planned to ensure that bespoke components of the wind farm can be installed before deep winter, when conditions may prevent installation. Murphy Decl. ¶¶ 31–35. While in some types of construction, delays of weeks could be mitigated or might be compensable, Ørsted has explained that a delay beyond September 22, 2025 imperils the entire project and threatens unsustainable losses for the company. Murphy Decl. ¶¶ 25, 27–28.

Awaiting final adjudication on the merits of the States' claims, which could take years, would ensure that the Revolution Wind project would never take place as it was planned for and approved by myriad state and federal regulators. Murphy Decl. ¶ 28 ("[E]ven a relatively brief delay could push the operational date of the Project into 2027, beyond the deadlines in three of the Project's PPAs (the two 2018 Connecticut PPAs and the 2018 Rhode Island PPA) rendering the Project potentially unviable."). Even assuming that Ørsted would be able and willing to fulfill its contractual commitments at a later date, construction and interconnection of the renewable energy expected from Revolution Wind occurring at a later date would upend the assumptions on which Rhode Island and Connecticut have relied in assessing environmental impacts, pricing their power purchase agreements, and evaluating the power generation needs of their electric grids. Relief at the end of this case, as opposed to preliminary relief, will not be sufficient to fully avoid the

32

irreparable harm to the States. *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 74 (1st Cir. 2004) (preliminary injunction not warranted if harm can be avoided by final relief in the case).

      B.      The Harms the States Will Suffer Will Be Irreparable.

          1.   The Stop Work Order Infringes on the States' Sovereign Interests and Interferes with Their Ability to Comply with State Statutory Mandates.

In addition to being imminent, these harms are irreparable. Both Rhode Island and Connecticut have time-sensitive statutory mandates for greenhouse gas reductions and renewable power that must be met. Revolution Wind represents a sizable contribution to these state policy mandates and there is no currently available alternative that would allow each State to meet their policy objectives. These policy needs are complex and interrelated.

For example, Rhode Island requires entities responsible for complying with the State's Renewable Energy Standard, including its largest public electric utility, Rhode Island Energy, to explain how they will procure RECs, the metric by which renewable energy requirements are measured, in a public proceeding that ends in the Rhode Island Public Utility Commission's approval of the plan. *See* 810-RICR-40-05-2.9. When the Rhode Island Public Utility Commission reviewed Rhode Island Energy's procurement plan for 2025, it accounted for the RECs Revolution Wind will provide in future years. Bianco Decl., attached as Ex. 5, ¶ 42. Delay in Revolution Winds operational date, and therefore its RECs would also destroy a hedge, or risk-reduction strategy, that was reviewed and approved by the Rhode Island Public Utilities Commission. Bianco Decl. ¶¶ 39–43. Delay or cancellation of Revolution Wind frustrates long-term planning for compliance with the Rhode Island Renewable Energy Standard, and would require a significant change of course. Bianco Decl. ¶ 43. For the States, "the inability to enforce [ ] duly enacted plans clearly inflicts irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018); *see also Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (noting that harms to a state's "sovereign

interests and public policies" are irreparable); *Allco Fin., Ltd. v. Klee*, 861 F.3d 82, 106 (2d Cir. 2017) (recognizing "the importance of Connecticut's interest in protecting the market for RECs produced within the ISO-NE or in adjacent areas"). Moreover, the addition of Revolution Wind's generating capacity is expected to lower electricity market prices and RECs throughout New England. Bianco Decl. ¶¶ 32–33. Absent this influx of RECs into the market, Rhode Islanders will pay more in the effort to comply with the Rhode Island Renewable Energy Standard. Bianco Decl. ¶ 37.

The same is true for Connecticut. Connecticut's statutory scheme enshrines policy goals the State has been pursuing for decades. It requires the State to reduce GHG emissions and consider that requirement when procuring energy. *See* Conn. Gen. Stat. §§ 22a-200 (providing the state "shall" reduce emissions by certain dates); 16a-3d (requiring CT DEEP Commissioner to prepare a comprehensive energy strategy to reduce emissions); 16a-3a (requiring CT DEEP Commissioner to approve an integrated resource plan to reduce emissions). These mandates led Connecticut to procure 304 MW of electricity from Revolution Wind and the power purchase agreements with Connecticut distributors that followed. Connecticut has been counting on the clean energy that Revolution Wind promises to supply since at least 2021, when it incorporated the project into its Integrated Resource Plan. Dykes Decl. ¶¶ 53, 25. Connecticut would have planned differently had Revolution Wind not been available.

Because the Stop Work Order infringes on the States' sovereign interest in complying with their laws and achieving their public policies, it damages them irreparably. *See West Virginia v. EPA*, 669 F. Supp. 3d 781, 811 (D.N.D. 2023) (finding irreparable state harm where proposed federal rule would infringe on state agency's enforcement authority and ability to exercise its discretion in managing state water quality); *Tennessee v. United States Dep't of Educ.*, 615 F. Supp.

34

3d 807, 841 (E.D. Tenn. 2022) (finding immediate irreparable harm to states' sovereign interests where the challenged federal guidance conflicted with several of the states' statutes).

2. Delaying Revolution Wind Will Lead to More Irreparable Pollution in the States than They Would Otherwise Experience.

Of course, fulfilling the States' statutory mandates serves a greater purpose: reducing climate-change-causing emissions, mitigating pollution in the air that Rhode Island and Connecticut share, and preserving New England's environment. The States selected Revolution Wind with that goal in mind. For every megawatt of electricity that Revolution Wind produces, one less megawatt of electricity will be generated for the New England grid by a fossil-fuel-burning plant. The States will lose this benefit and suffer "more pollution in the near future" absent preliminary injunctive relief. Babbidge Decl., attached as Ex. 6, ¶ 6.

"[E]nvironmental harm," the First Circuit has explained, is "a perfectly proper factor for a district court to take into account in assessing . . . a motion for a preliminary injunction." *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989). It is a proper consideration because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014); *see California v. BLM*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018) ("[S]everal courts, including the Supreme Court, have found that increased air pollution can constitute irreparable harm.").

The States have a particularly strong interest in guarding against pollution and preserving their environment. *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (recognizing "Massachusetts' well-founded desire to preserve its sovereign territory"); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) ("[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain."); *New York v. Trump*, 769 F. Supp. 3d 119,

35

144 (D.R.I. 2025) (highlighting how funding freeze threatened states' efforts to mitigate air pollution).

Revolution Wind promises to reduce air pollution in New England. As Tracy Babbidge of CT DEEP puts it, "New England, including Connecticut, will experience more pollution on any given day without Revolution Wind operational than it would on the same day if Revolution Wind was operational." Babbidge Decl. ¶ 20; *see also* Dykes Decl. ¶ 32. Revolution Wind will reduce pollution because pollution is tied to cost. The power generators with the highest marginal costs are fossil fuel burning plants that cause the most pollution, whereas Revolution Wind will have a $0 marginal cost and emits no pollutants. *See* Babbidge Decl. ¶¶ 7–9, 30. Because Revolution Wind is more cost effective, ISO-NE will select it over more expensive sources that would otherwise be needed. *See* Babbidge Decl. ¶¶ 7–9; Dykes Decl. ¶¶ 30–31 (explaining how offshore wind would have replaced polluting sources during cold snap in 2017).

For example, when a Connecticut nuclear power plant experienced an extended unplanned outage in 2023, ISO-NE had to rely on emitting sources to make up the difference. Babbidge Decl. ¶ 14. Had Revolution Wind been operational at the time, ISO-NE would have selected it because it would have been cheaper than the emitting sources, thereby reducing reliance on emitting sources. Babbidge Decl. ¶ 14; Dykes Decl. ¶ 30. In other words, when Revolution Wind comes online, there will be "fewer days where oil burning power is necessary to meet demand." Babbidge Decl. ¶ 13.

For the States to realize that benefit, preliminary relief is necessary. Each day that the Stop Work Order delays completion of Revolution Wind adds a day that New England will experience irreparable pollution, which it otherwise could have avoided by relying on the power from Revolution Wind.

36

      3.   The Stop Work Order Will Cause Widespread Economic Harm to the States.

The Administrative Procedure Act does not waive sovereign immunity for monetary damages, and the sovereign immunity bar therefore makes the States' economic damages irreparable. *See In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date[.]" (internal quotations omitted)); *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) ("Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists.").

      a.   The Stop Work Order's Chilling Effect Has Inflicted, and Will Continue to Inflict, Reputational Harm to the States.

The States have already suffered reputational harm because of the Stop Work Order. Rhode Island has made considerable policy and monetary investment in growing its ocean economy, a large portion of which is expected to be wind energy. Connecticut likewise released in 2023 an "Offshore Wind Strategic Roadmap" and launched the Connecticut Wind Collaborative, a public-private organization, to leverage the State's strengths in infrastructure, manufacturing, workforce, and research and development and to catalyze further economic growth, attract investment, and foster innovation in the State's offshore wind industry. Dykes Decl. ¶ 35. Rhode Island also has cultivated the Cambridge Innovation Center as a space for international companies to set up their first United States offices as they begin to contemplate wind development projects. Kearns Decl. ¶ 20; Cox Decl. ¶ 12. Recently, companies have begun to lay off staff and withdraw from leases. Cox Decl. ¶¶ 12–15. Moreover, Rhode Island is exploring developing an additional port in East Providence and is pursuing other opportunities to attract investment in this area. Cox Decl. ¶¶ 16–17. Since the Stop Work Order, meetings have been canceled and interest in further development of additional ports has dried up. Cox Decl. ¶¶ 13–16.

This reputational harm is already occurring, and it is the type of harm preliminary injunctions were meant to remedy. *See New York*, 769 F. Supp. 3d at 142, 144–145 (highlighting how states would have to regain industry trust if they had to suspend, delay, or cancel projects); *West Virginia*, 669 F. Supp. 3d at 811 (finding irreparable state harm where federal rule would harm agriculture industry); *Washington v. Dep't of Trans.*, No. 2:25-cv-00848-TL, 2025 U.S. Dist. LEXIS 119844, at *91 (W.D. Wash. June 24, 2025) (finding irreparable state harm where loss of federal funding caused "loss of industry confidence in States' [electric vehicle infrastructure] implementation programs"); *Ross-Simons of Warwick*, 102 F.3d at 20 ("[I]njury to . . . reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

> b. Without Revolution Wind, Ratepayers—Including the States—
> Will Pay More for Electricity.

Once operational, Revolution Wind will save ratepayers money. The power purchase agreements have locked in prices that are expected to be lower than average projected energy and REC costs over the contracts' lifetimes. Dykes Decl. ¶ 54. Connecticut expects that these agreements with Revolution Wind will save its ratepayers "hundreds of millions of dollars." Dykes Decl. ¶ 54. The States will enjoy those savings too because state agencies have to pay for electricity. For instance, Connecticut estimates that its agencies paid roughly $63,000,000 for electricity in 2023. Dykes Decl. ¶ 55.

The States will not enjoy the direct and indirect electric bill savings as planned if the Stop Work Order delays or prevents Revolution Wind's completion. *See* Dykes Decl. ¶ 56. That type of financial harm is irreparable. *See Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433–34 (5th Cir. 2016) (finding irreparable state harm where complying with federal rule would

38

increase rates for consumers); *Louisiana*, 622 F. Supp. 3d at 297 (finding states demonstrated a substantial threat of irreparable injury in part because federal action threatened "higher gas prices").

c.    The Stop Work Order Will Waste State Investment and Resources.

The States have invested millions of dollars and countless hours to support, permit, and procure energy from Revolution Wind. Those investments will be for naught if the project never comes to fruition.

If Revolution Wind fails, the States will need to procure 704 MW to replace the energy they have been counting on since 2018 and 2019. *See* Dykes Decl. ¶¶ 18–19. Duplicating that procurement process will waste taxpayer money, as one District Court recently recognized. *See Washington*, 2025 U.S. Dist. LEXIS 119844, at *96. In *Washington*, the District Cout found that the federal government's funding pause irreparably harmed states because it would force them to suspend or cancel electric vehicle projects they had solicited. Undertaking that solicitation process again, the court explained, would mean "the administrative cost has been doubled without any commensurate increase to the benefit: two solicitations undertaken, but only one project realized." *Id.* at *29. The same would be true here: the significant time and money the States spent identifying, selecting, and authorizing Revolution Wind would be wasted and additional time and ratepayer money will be spent to find a replacement. Dykes Decl. ¶ 18; *see West Virginia*, 669 F. Supp. 3d at, 811 (D.N.D. 2023) (finding irreparable state harm where state agency would have to expend resources to determine how to comply with challenged federal rule).

The States' infrastructure investments similarly would be at risk. To support Revolution Wind, Connecticut invested $200,000,000 to redevelop the State Pier Terminal in New London into a world-class heavy-lift maritime facility and hub for offshore wind. Dykes Decl. ¶ 36. The Connecticut Port Authority, a quasi-public agency, owns the State Pier Terminal and leases it to Ørsted. Dykes Decl. ¶¶ 60, 37. Ørsted is using the Terminal to assemble and deliver turbines as it

constructs Revolution Wind. Dykes Decl. ¶¶ 37–38. If the Stop Work Order prevents Ørsted from completing Revolution Wind, then Connecticut will not realize the benefit of the investment it made in the State Pier Terminal to support that project.

    d. Job Losses Stemming from the Stop Work Order Will Hurt the States.

Revolution Wind supports about 1,200 jobs in Connecticut and Rhode Island alone. Dykes Decl. ¶ 57. If those jobs are lost because Revolution Wind goes under, the States' economies inevitably will suffer. Dykes Decl. ¶¶ 57, 64. *See Texas*, 829 F.3d at 434 (finding irreparable state harm where compliance with federal rule may increase unemployment due to the permanent closure of power plants); *Louisiana*, 622 F. Supp. 3d at 297 (finding irreparable harm where "Plaintiff States are also claiming damages through loss of jobs").

    4. The Stop Work Order Makes New England's Grid Less Reliable.

Courts have also recognized the unique nature of threats to the public's access to electricity, repeatedly finding that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Texas*, 829 F.3d at 434; *Kentucky v. United States Env't Prot. Agency*, No. 23-3216, 2023 WL 11871967, at *4 (6th Cir. July 25, 2023) (quoting *Texas*); *New York*, 769 F. Supp. 3d at 145 (basing irreparable harm finding in part on evidence that delaying grid resilience improvements would potentially increase the risk of damage to the grid in severe weather and cause additional harm to small municipal electric utilities).

One of Revolution Wind's primary expected benefits was improved grid reliability and reduced risk of power outages. Wind generation makes New England's grid more reliable because it reduces dependence on fossil fuels, all of which are imported from outside the region and are in high demand during the winter. Dykes Decl. ¶ 28. At least 5,000 MW of aging fossil fuel generation needs to be replaced in the coming years just to maintain the level of reliability that

40

New England's grid currently enjoys. Dykes Decl. ¶ 29. Simply put, losing Revolution Wind would "undermine the power grid's reliability." Dykes Decl. ¶ 51 (quoting ISO-NE); Kearns Decl. ¶¶ 29–30.

## V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

The balance of the equities and the public interest strongly favor preliminary relief. The two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In weighing them, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief ... pay[ing] particular regard for the public consequences" that would result from either granting or denying the requested emergency relief. *Winter*, 555 U.S. at 24 (2008) (quotation marks and citations omitted).

Here, the balance tips decisively in favor of granting the requested relief. The Stop Work Order itself indicates that no clear benefit would result from permitting it to remain in effect, since it suggests that BOEM has *not yet determined* that the continued progress of the Revolution Wind project is likely to lead to any specific harm or increased risk, let alone one that would permit BOEM to suspend it. On the other hand, Sections II.E and IV catalog the litany of interests that halting this project threatens.

Moreover, the public "has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citations omitted)). Conversely, "there is no public interest in upholding unlawful agency action,"

and an injunction that merely ends an unlawful practice cannot cause the federal government harm. *Nat'l Inst. of Health*, 770 F. Supp. 3d at 327. Indeed, courts may not "consider any and all factors that might relate to the public interest" if it would "reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). As the Plaintiff States have shown, Defendants' arbitrary and unlawful Stop Work Order violates the APA, OCSLA, and is ultra vires. There is thus a strong public interest in vacating and enjoining that action and allowing previously approved operations and activities to resume.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant their motion for a preliminary injunction. Plaintiff States also respectfully request this Court schedule oral argument and a hearing on this matter for approximately two hours or as long as the Court deems appropriate.

Respectfully submitted,

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Sarah W. Rice*
Katherine Connolly Sadeck (Bar No. 8637)
*Solicitor General*
Sarah W. Rice (Bar No. 10588)
*Assistant Attorney General*
Nicholas M. Vaz (Bar No. 9501)
*Special Assistant Attorney General*
Alex Carnevale (Bar No. 10724)
*Special Assistant Attorney General*
Leonard Giarrano IV (Bar No. 10731)
*Special Assistant Attorney General*
Judy M. Shih* (CA Bar No. 206394)
*Special Assistant Attorney General*
Maithreyi Ratakonda* (NY Bar No. 5060124)
*Special Assistant Attorney General*
Max Jordan Kober* (NY Bar No. 5911409)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Tel.: (401) 274-4400
ksadeck@riag.ri.gov
srice@riag.ri.gov
nvaz@riag.ri.gov
acarnevale@riag.ri.gov
lgiarrano@riag.ri.gov
judy@statesunited.org
mai@statesunited.org
max@statesunited.org

*Counsel for the State of Rhode Island*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Evan O'Roark*
Michael K. Skold* (CT Bar No. ct28407)
*Solicitor General*
Matthew I. Levine* (CT Bar No. ct18898)
*Deputy Associate Attorney General*
Evan O'Roark* (CT Bar No. ct30562)
*Deputy Solicitor General*
Benjamin Cheney* (CT Bar No. ct29685)
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Tel.: (860) 808-5316
michael.skold@ct.gov
matthew.levine@ct.gov
evan.oroark@ct.gov
benjamin.cheney@ct.gov

*Counsel for the State of Connecticut and Katherine Dykes*

*\* Admitted pro hac vice*

43

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of September 2025, I electronically filed the foregoing Motion for Preliminary Injunction using the CM/ECF electronic filing system, thereby causing it to be electronically transmitted to counsel for all parties of record.

*/s/ Leonard Giarrano IV*

44