# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>          Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF<br>OCEAN ENERGY MANAGEMENT; MATTHEW<br>GIACONA, Acting Director of Bureau of Ocean<br>Energy Management, in his official capacity;<br>BUREAU OF SAFETY AND ENVIRONMENTAL<br>ENFORCEMENT; and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>          Defendants. | C.A. No. 1:25-cv-04328-RCL |

**DECLARATION OF KATHERINE S. DYKES**
**COMMISSIONER OF THE CONNECTICUT DEPARTMENT**
**OF ENERGY AND ENVIRONMENTAL PROTECTION**

I, Katherine S. Dykes, declare as follows:

1.    I am the Commissioner of the State of Connecticut Department of Energy and

Environmental Protection (DEEP). In this matter, I previously submitted a declaration dated

September 16, 2025 (September 2025 Declaration), which is attached as **Exhibit 1**. My credentials

and experience are detailed therein. I submitted the September 2025 Declaration in support of the

State Plaintiffs' September 17, 2025, motion for a preliminary injunction and challenge to an

August 22, 2025, Stop Work Order issued by the Acting Director of the Bureau of Ocean Energy

1

Management (BOEM), Matthew Giacona; that Order had required Ørsted to immediately stop construction of Revolution Wind (First Stop Work Order).

2.      I submit this declaration in support of the State Plaintiffs' motion for a preliminary injunction and challenge to the December 22, 2025, Stop Work Order issued by BOEM Acting Director Giacona, requiring Revolution Wind's developer, Ørsted, to suspend all ongoing activities related to this project on the Outer Continental Shelf for at least 90 days (Second Stop Work Order). A true and accurate copy of the Second Stop Work Order is attached as **Exhibit 2**.

3.      On September 22, 2025, this Court issued a preliminary injunction blocking the First Stop Work Order in response to a separate challenge to that order brought by Ørsted. That preliminary injunction enabled construction of Revolution Wind on the Outer Continental Shelf to resume. Following the issuance of that preliminary injunction, Ørsted resumed offshore construction of Revolution Wind, and the project is now approximately 87% complete, with its offshore cables substantially complete and 89% (58 of 65) of its turbines now installed. Based on this progress, prior to receiving the Second Stop Work Order, Ørsted expected to begin delivering power from Revolution Wind to the New England grid as early as January 2026 and to reach full commercial operation in October 2026. *See* Ørsted Statement of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction and Stay Pending Review (Dkt. No. 50), at 27; Ørsted Supplemental Complaint (Dkt. No. 52), at ¶ 133. As explained in my September 2025 Declaration, at that point of full operation, the project will deliver its full electricity and Renewable Energy Certificates to Connecticut and Rhode Island, as well as provide significant wholesale energy and capacity market and reliability benefits to the broader New England grid. *See* September 2025 Declaration, at ¶¶ 22, 26-32, 50-52.

4.    However, on December 22, 2025, BOEM upended the project's timeline once again by issuing the Second Stop Work Order. This Second Stop Work Order directs Ørsted "to suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days." The order states "BOEM may further extend the 90-day suspension period" and only "activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment" are permitted to continue.

5.    As with the First Stop Work Order, the Second Stop Work Order cites purported "national security" reasons for ordering the project to halt construction. As discussed in my prior declaration, the Record of Decision (ROD) for Revolution Wind's Construction and Operations Plan (COP)—issued by BOEM, the Department of Defense (U.S. Army Corps of Engineers), and the Department of Commerce (National Marine Fisheries Service) on August 21, 2023—notes that "[a]t each stage of the regulatory process . . . BOEM has consulted with the [Department of Defense] for the purposes of assessing national security considerations in its decision-making processes." *See* September 2025 Declaration, at ¶ 43 (detailing significant record of national security approval).

6.    This declaration supplements the information in my September 2025 Declaration on the range of existing interests—including statutory, economic, and environmental—that Connecticut has in the Revolution Wind offshore wind project. Many of the same harms caused by the First Stop Work Order are again caused by the issuance of the Second Stop Work Order. However, because the Revolution Wind project has already suffered a delay due to the First Stop Work Order, the harms that Connecticut will and may face as a result of the Second Stop Work Order are potentially even more severe.

**The Second Stop Work Order Will Harm Connecticut.**

7.    As detailed in my September 2025 Declaration, the First Stop Work Order threatened Connecticut's numerous interests in the project. These interests include the state's need for new reliable and affordable electricity generation to help meet Connecticut and New England's growing electricity demand; the project's planned contribution to meeting the state's statutory mandates to transition to clean, renewable energy; benefits to Connecticut from the state's significant investment in the State Pier Terminal in New London, Connecticut (State Pier), which is being used to construct Revolution Wind and other offshore wind projects; and approximately 1,200 jobs in Connecticut and Rhode Island, including jobs at the State Pier, being created by the project. *See* September 2025 Declaration, at ¶¶ 44-64.

8.    Although the September 22, 2025, preliminary injunction allowed Revolution Wind to resume construction, the impact of the First Stop Work Order on the project's construction continues and exceeds the month-long period during which that Stop Work Order was in force. *See* Ørsted Supplemental Complaint (Dkt. No. 52) at ¶¶ 136, 187.

9.    Delays in Revolution Wind's construction and the resulting impacts on project viability or, at the least, the potential commercial operation date caused by the First Stop Work Order continue to harm Connecticut by delaying and threatening to undermine the reliability, affordability, environmental, economic development, and job-creation benefits detailed in the September 2025 Declaration, which the state is counting on from the project.

10.    Thus, the Second Stop Work Order not only further exacerbates the issues that have resulted from the issuance of the First Stop Work Order, but it also creates new harms to the Plaintiff States.

11.     As with the First Stop Work Order, according to Ørsted, the Second Stop Work Order threatens the company's ability to complete Revolution Wind. This is in part because the specialized vessels needed to install Revolution Wind's remaining turbines are contracted to perform work on other projects and will soon become unavailable. Without these vessels, Ørsted will be unable to complete the project as planned. If delays caused by the Second Stop Work Order prevent Ørsted from being able to complete Revolution Wind's construction under its existing vessel contracts, it is unclear when or if replacement vessels could be contracted to complete the project given high global demand and limited global vessel supply. *See, e.g.*, Ørsted Supplemental Complaint, at ¶¶ 30-31, 186.

12.     Similarly to the First Stop Work Order, delays caused by the Second Stop Work Order are impacting the project's financial viability. Ørsted estimates that the Second Stop Work Order is costing the company at least $1.44 million per day and threatens to undermine its ability to deliver on and receive revenues under its contracts to Connecticut and Rhode Island. *See* Ørsted Supplemental Complaint, at ¶¶ 20, 28.

13.     The Second Stop Work Order also creates existential risk that BOEM will not allow Revolution Wind to continue. The Second Stop Work Order states that, over the next 90 days, and potentially longer, BOEM will consider as-yet unknown "mitigation measures," with unknown impacts to the project's viability, while also considering "whether the project must be cancelled" entirely.

14.     As detailed in my prior declaration, if Revolution Wind is unable to move forward either as a result of a BOEM directive to cancel the project or because of insurmountable new project conditions or delays caused by either the First or Second Stop Work Order, considerable

harm will result to Connecticut's energy security, environment, statutory mandates, consumer costs, and employment and economic development. *See* September 2025 Declaration, at ¶¶ 44-64.

15.     Connecticut and the New England region continue to need the power that will be provided by Revolution Wind for electric reliability. Connecticut is counting on the 304 megawatts (MW) of Revolution Wind contracted to the state's electric distribution utilities to meet approximately 5% of state load once the project comes online this year. There are no near-term new energy resources that can come online to replace Revolution Wind's contributions to Connecticut in the time that the project has been expected to come online in 2026. Prior to the Second Stop Work Order, Revolution Wind has been expected to begin delivering power as early as this month, during the winter period when power is most needed in New England to ensure the reliability of the grid.

16.     New England's independent regional grid operator, ISO New England (ISO-NE), which previously raised concerns about the impact of the First Stop Work Order on regional grid reliability, reiterated those concerns in a second statement on December 22, 2025, following the Second Stop Work Order.

17.     ISO-NE's statement on the Second Stop Work Order, which incorporated a reference to Vineyard Wind,[1] says: "Through the region's wholesale markets, both Vineyard Wind and Revolution Wind have committed to helping meet New England's demand for electricity. Both projects are included in our near-term and future modeling and analyses to ensure adequate electricity for New England. These projects are particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained. While

---

[1] BOEM issued a similar Stop Work Order to Vineyard Wind 1, an 800 MW offshore wind project contracted to Massachusetts that is even further along in its construction and is already providing power to the New England grid.

ISO-NE forecasts enough generation capacity is available for the current season, canceling or delaying these projects will increase costs and risks to reliability in our region. Beyond increasing risk to reliability, delays of new generating resources also will adversely affect New England's economy and industrial growth, including potential future data centers."[2] ISO-NE notes that "Revolution Wind is also largely complete and the ISO anticipates the project to come online in 2026."

18.    ISO-NE's statement on the Second Stop Work Order further underscores concerns that preventing Revolution Wind from moving forward will harm New England's ability to attract investment to the region and bring online other necessary energy infrastructure: "As we stated in August, New England must maintain and add to its energy infrastructure. Unpredictable risks and threats to resources — regardless of technology — that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future."

19.    As discussed in greater detail in my prior declaration, New England needs thousands of megawatts of new generation resources to come online in the coming years to both meet growing regional electricity demand and replace aging power generation resources that ISO-NE expects to retire. Offshore wind is a significant new resource that Connecticut and ISO-NE are counting on to help meet this need, including during the winter when New England faces significant reliability challenges and offshore wind performs at its best. *See* September 2025 Declaration, at ¶¶ 27-29, 50-53.

---

[2] ISO-NE statement available at: https://isonewswire.com/2025/12/22/iso-new-england-statement-on-department-of-the-interior-offshore-wind-announcement/ (last visited January 4, 2026).

20.     Offshore wind will provide reliability, affordability, and environmental benefits throughout the year and particularly during the winter. My prior declaration cited a December 2018 assessment by ISO-NE that found that if 1,600 MW of offshore wind generation had been available in the region during an extended cold weather period from December 24, 2017, to January 8, 2018, it could have (1) lowered regional electricity production costs by $80-85 million, resulting in an $11-13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; (2) avoided emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and (3) avoided consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil. Notably, Revolution Wind and Vineyard Wind combined will be about 1,500 MW, similar to the number in ISO-NE's study. *See* September 2025 Declaration, at ¶ 31.

21.     Those types of benefits were supposed to start flowing from Revolution Wind to Connecticut, the regional grid, and ratepayers as early as this month—January 2026. The Second Stop Work Order all but assures those benefits will not be realized until after this winter, if ever.

22.     By providing a new source of low marginal cost power in New England, Revolution Wind will cause wholesale energy and capacity market costs in New England to be lower. Once operational, Revolution Wind alone will provide hundreds of millions of dollars each year in energy bill savings to New England, of which approximately 25% of these benefits will accrue to Connecticut ratepayers, based on our state's share of total regional load.

23.     Revolution Wind has already cleared in the region's capacity market, which ISO-NE runs to ensure New England has sufficient generation to meet demand reliably. If the project ultimately is unable to move forward as a result of BOEM's Stop Work Order(s), the need to replace its capacity in the coming years would cause electricity rates in New England to increase

by hundreds of millions of dollars a year, raising costs to Connecticut ratepayers, and would significantly raise reliability risks at a time when significant growth in electricity demand is expected to occur.

24.     Even if Revolution Wind is ultimately able to come online, potential delays in its operation date caused by BOEM's Stop Work Orders threaten to harm Connecticut ratepayers. DEEP estimates that a 90-day delay in the commercial operation date of Revolution Wind would cost ratepayers in Connecticut and the broader New England region approximately $350,000 a day for the duration of the delay in higher electricity costs, for a 90 day total of approximately $31 million in higher electricity costs. If the Second Stop Work Order is extended, as the order states is possible, and causes further delays to the project, these harms would continue to grow.

25.     Beyond its contributions to electricity reliability and affordability, Connecticut is counting on Revolution Wind to deliver Renewable Energy Certificates needed to help meet the state's statutory mandates to reduce greenhouse gas emissions and transition to cleaner sources of power. If Revolution Wind is unable to move forward, progress toward these Connecticut statutory mandates will suffer. *See* September 2025 Declaration, at ¶¶ 10, 21, 45, 53.

26.     As with the First Stop Work Order, the Second Stop Work Order also threatens economic harm to Connecticut. It undermines the state's significant economic investment in the State Pier to enable offshore wind. The Second Stop Work Order also puts at risk the employment of hundreds of Connecticut workers involved in the Revolution Wind project. These investments and jobs and the harms of halting the project are discussed in my prior declaration on the First Stop Work Order and apply as well to BOEM's Second Stop Work Order. *See* September 2025 Declaration, at ¶¶ 36-39, 57-60.

27.     In sum, as explained above and in my prior declaration, by halting the fully-permitted and mostly-constructed Revolution Wind project, the Second Stop Work Order is causing immediate harms and will continue to harm the State of Connecticut and its residents. These harms replicate and compound the harms caused by the First Stop Work Order and include: undermining compliance with the State's climate and renewable energy laws; damaging grid reliability; forcing reliance on other, more environmentally damaging, import-constrained, and price-volatile sources of electricity; increasing electricity rates to consumers; and hurting the State's economy through job losses, foregone job creation, and long-term damage to the development of the wind energy industry in the State. If Revolution Wind is unable to resume construction quickly, the harms of the Second Stop Work Order will grow as even shorter-term delays caused by the order may prevent Revolution Wind from being able to be completed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, Connecticut on January 5, 2026.

_Katherine S. Dykes_

_____

Katherine S. Dykes

Commissioner of the Connecticut Department of
Energy and Environmental Protection

10

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF RHODE ISLAND;<br>STATE OF CONNECTICUT; and<br>KATHERINE DYKES, Commissioner of the<br>Connecticut Department of Energy and Environmental<br>Protection,<br><br>    Plaintiffs,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR; DOUGLAS BURGUM, Secretary of the<br>Interior, in his official capacity; BUREAU OF<br>OCEAN ENERGY MANAGEMENT; MATTHEW<br>GIACONA, Acting Director of Bureau of Ocean<br>Energy Management, in his official capacity;<br>BUREAU OF SAFETY AND ENVIRONMENTAL<br>ENFORCEMENT; and KENNETH STEVENS,<br>Principal Deputy Director of the Bureau of Safety and<br>Environmental Enforcement, in his official capacity,<br><br>    Defendants. | C.A. No. 1:25-cv-00439 |

**DECLARATION OF KATHERINE S. DYKES**
**COMMISSIONER OF THE CONNECTICUT DEPARTMENT**
**OF ENERGY AND ENVIRONMENTAL PROTECTION**

  I, Katherine S. Dykes, declare as follows:

  1.  I am the Commissioner of the State of Connecticut Department of Energy and Environmental Protection (DEEP). I submit this declaration in support of Plaintiffs' preliminary injunction motion.

  2.  I was appointed Commissioner of DEEP by Connecticut Governor Ned Lamont and confirmed by the Connecticut General Assembly on February 20, 2019. Prior to becoming

1

Commissioner, I served DEEP as Deputy Commissioner for Energy (2012-2016) and as Chair of the Connecticut Public Utilities Regulatory Authority (2016-2019).

3.      I hold a bachelor's degree in history and environmental studies from Yale University, a master's degree in history, also from Yale, and a juris doctor from Yale Law School.

4.      In 2011, Connecticut Governor Dannel P. Malloy recognized the interconnectivity of effective energy and environmental policies. Along with the Connecticut General Assembly, he merged three entities—the Department of Environmental Protection, the Department of Public Utility Control, and an energy office within the Office of Policy and Management—to create the single agency of DEEP. This action more successfully aligned Connecticut's energy and environmental policies.

5.      I submit this declaration in support of the Plaintiffs' motion for a preliminary injunction and challenge to the August 22, 2025, Stop Work Order issued by the Acting Director of the Bureau of Ocean Energy Management (BOEM), Matthew Giacona, requiring Revolution Wind's developer, Ørsted, to immediately stop construction (Stop Work Order).

6.      This declaration outlines the range of existing interests, from statutory to economic to environmental, that Connecticut has in the Revolution Wind offshore wind project and the harms that have and will come from the Stop Work Order.

**Connecticut Has a Legislative Mandate to Transition to Clean, Renewable Energy.**

7.      As Commissioner of DEEP, I am responsible for carrying out programs that protect Connecticut's air, water, and land that power the State with clean, reliable, and affordable energy. My role in leading and creating energy policies is to firmly place Connecticut on a successful clean energy trajectory to meet the State's energy needs affordably and reliably and to achieve the State's legislatively adopted climate change mitigation requirements using a multifaceted approach.

8.     For instance, Connecticut is reducing carbon dioxide ($CO_2$) emissions from fossil fuel-burning power plants through participation in the multistate, market-based initiative known as the Regional Greenhouse Gas Initiative (RGGI).

9.     Connecticut is focused on implementing energy efficiency programs to reduce the demand for electricity and the amount of fuel needed to generate power and to in turn reduce costs and improve electric reliability for Connecticut residents and businesses.

10.     Connecticut has had a Renewable Portfolio Standard (RPS) in some form since 1998. The RPS requires electric load serving entities to obtain a specified percentage of the electricity they sell or distribute to Connecticut customers from renewable energy sources through the purchase of Renewable Energy Certificates (RECs). The total renewable energy output requirements increase each year. The RPS requires load serving entities to obtain at least 33% of the electricity they sell or distribute in Connecticut from renewable energy sources, such as wind, by January 1, 2030.

11.     Conn. Gen. Stat. § 22a-200a, amended as recently as the State's 2025 legislative session, requires Connecticut to achieve State economy-wide greenhouse gas (GHG) emission reductions of at least 45% below 2001's GHG emissions level by January 1, 2030, 65% below 2001 levels by January 1, 2040, and, by January 1, 2050, to an economy-wide net-zero level, provided GHG emissions are at least 80% below the 2001 level. In the electricity sector specifically, Conn. Gen. Stat. § 22a-200a further requires the State to achieve a 100% GHG emissions free (zero-carbon) electricity supply by January 1, 2040.

12.     Conn. Gen. Stat. §§ 16a-3a(a) and 16a-3d(a) also incorporate GHG reductions into Connecticut's Integrated Resources Plan (IRP), Comprehensive Energy Strategy, and various other State planning documents and efforts.

3

13.     To help achieve these climate change and renewable energy requirements and meet Connecticut's need for reliable and affordable electricity, the Connecticut Legislature has provided DEEP with authority to procure new renewable energy resources, including offshore wind, for the State. In 2019, the Connecticut Legislature passed an offshore wind Act, codified in Conn. Gen. Stat. § 16a-3n, that created a process for DEEP to work with other Connecticut state officials to solicit competitive proposals for offshore wind projects. This section also authorizes DEEP to direct the State's electric distribution companies to enter into long-term contracts with bidders meeting certain criteria, which DEEP has done. DEEP also has similar procurement authority for additional renewable energy resources, including offshore wind, codified in Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

14.     Conn. Gen. Stat. § 16a-3a requires DEEP to assess and plan through an IRP for the State's electric sector needs, including electric reliability and achievement of the State's GHG reduction goals. DEEP last published an IRP in October 2021 and is currently working on the next iteration. The October 2021 IRP included electric sector modelling, a detailed reliability analysis, and recommendations on actions, including future procurements of renewable energy, to achieve the 2040 zero-carbon electricity supply requirement.

**Connecticut Is Pursuing Offshore Wind Generation to Meet the State's Energy and Environmental Needs.**

15.     To meet the 100% zero-carbon electricity supply by 2040 requirement, the State will need higher levels of renewable energy or other zero-carbon energy resources than it has today. Currently, Connecticut's electricity supply is approximately 71% zero-carbon.

16.     Most of this existing zero-carbon energy comes from Connecticut's contract with the Millstone nuclear generating facility, which accounts for approximately 87% of the 71% figure. Connecticut's zero-carbon electricity supply percentage may drop significantly when the long-

4

term contract that Connecticut has with Millstone expires in 2029. Connecticut currently purchases nearly all zero-carbon environmental attributes associated with the power from Millstone. After the existing Millstone contract expires, other zero-carbon energy resources may be needed to replace some or all of Millstone's current contributions to the State's zero-carbon electricity supply. Even with Millstone included, additional zero-carbon energy sources will be needed to close the gap between Connecticut's current 71% level of zero-carbon electricity supply and the requirement to achieve a 100% zero-carbon electricity supply by January 1, 2040. The need to procure additional zero-carbon energy to achieve this requirement will likely increase further over time as electricity demand increases in the State and more zero-carbon energy is needed to meet this growing demand.

17.    One way in which Connecticut is working to shift reliance away from climate change-causing fossil fuels and toward renewable energy sources—as needed to achieve the RPS and the State's broader climate change requirements, including the 100% zero-carbon electricity supply requirement—is through offshore wind generation that the State is procuring directly.

18.    In 2018 and 2019, using its authority under Conn. Gen. Stat. §§ 16a-3n and 16a-3m, DEEP selected 200 megawatts (MW) and 104 MW from the Revolution Wind offshore wind project in two separate competitive solicitations. For each solicitation, DEEP spent approximately one year of staff time developing the solicitation documents, reviewing and evaluating bids, and developing materials justifying its selection decision in each solicitation before the State's Public Utilities Regulatory Authority (PURA). Each solicitation required expenditure of significant staff time by DEEP, DEEP's consultant hired to do electric sector modeling, PURA, the State's Office of Consumer Counsel, and the State's electric distribution companies, which is all paid for by the State's electric ratepayers. If Connecticut needed to go out and purchase additional zero-carbon

generation to replace the Revolution Wind project, the significant time and ratepayer money spent to enter into the contracts with Revolution Wind would be wasted and additional time and ratepayer money would be needed to find a replacement.

19.    Rhode Island separately selected an additional 400 MW from Revolution Wind, for a total project size of 704 MW.

20.    In Connecticut, the Revolution Wind project entered into contract negotiations with Connecticut's electric distribution companies, Eversource and United Illuminating. The resulting contracts were submitted to PURA for review and approval. PURA approved those contracts in Docket Nos. 18-06-37 and 18-05-04. Rhode Island's utility regulator separately approved that state's contract with Revolution Wind.

21.    On its own, Connecticut's procurement of 304 MW of Revolution Wind will not achieve the State's climate change and renewable energy requirements, but these 304 MW of offshore wind would help significantly by providing new zero-carbon energy and associated RECs equivalent to approximately 5% of the State's current electricity supply.

22.    Revolution Wind has received all necessary federal permits and is currently under construction, both onshore and in federal waters. The project is approximately 80% complete, with all its offshore foundations and 45 of its 65 turbines already installed, and is expected to reach commercial operation in 2026. At that point, the project will deliver electricity and RECs to Connecticut and Rhode Island, as well as provide wholesale energy and capacity market and reliability benefits to the broader New England grid.

23.    Revolution Wind has been thoroughly studied by both federal and state regulators over more than a decade, including the initial lease area identification and execution, and has received all its required federal and state permits, including final approval of its Construction and

Operations Plan (COP) by BOEM on November 20, 2023. BOEM's approval of a COP includes thorough environmental review as well as review to ensure the offshore wind project will not unreasonably interfere with other uses of the outer continental shelf, including those involved with national security or defense. BOEM's COP approval for Revolution Wind includes all those conditions and protections.

24.    In addition to the procurement of offshore wind energy from Revolution Wind, Connecticut also has an interest in potential future procurements of offshore wind energy. Conn. Gen. Stat. § 16a-3n provides DEEP with further statutory authority to conduct competitive solicitations for up to 2,000 MW of additional offshore wind to meet Connecticut's energy and environmental requirements. DEEP also has authority to conduct additional new competitive solicitations for offshore wind, and other renewable energy resources, under Conn. Gen. Stat. §§ 16a-3f, 16a-3g, 16a-3h, 16a-3j, and 16a-3m.

25.    DEEP's October 2021 IRP relied on the fact that Revolution Wind would come online and contribute to the State's 2040 zero-carbon electricity supply requirement. If DEEP had not been able to rely on the clean power from Revolution Wind, this statutorily mandated planning effort would have, for example, included accelerated procurement efforts for other zero-carbon energy resources.

**Offshore Wind Generation Provides Electricity Reliability and Affordability Benefits to Connecticut.**

26.    Connecticut procuring offshore wind energy is critical to both reliability and affordability.

27.    New England's grid operator, ISO New England (ISO-NE), issued a December 2023 report on the "Operational Impact of Extreme Weather Events" concluding that New England must add additional electricity generation. That additional generation would include potentially

4,000 MW of new offshore wind generation (over and above projects already under construction like Revolution Wind) as well as thousands of megawatts of other new renewable energy resources by 2032.

28.     Wind generation contributes to grid reliability by reducing Connecticut's and New England's reliance on fossil fuels, all of which must be imported from outside the region. New England currently relies on natural gas to generate approximately half of the region's electricity. This creates reliability concerns during the winter, when there is high natural gas demand for heating, or in cases where unanticipated disruptions to the pipeline system or unavailability of gas limit the ability of natural gas-fired generators to run. Wind energy can help fill these gaps and reduce the region's reliance on natural gas.

29.     ISO-NE's "Operational Impact of Extreme Weather Events" report further identifies a need for New England to replace over 5,000 MW of aging fossil fuel generation in the coming years with new sources of power generation to maintain a reliable grid. By contributing new power generation and diversifying the region's electricity mix, offshore wind can help address these reliability concerns.

30.     In addition to contributing to reliability, wind energy generation does not require fuel to operate and thus has low or no marginal production costs. ISO-NE chooses the cheapest generation to meet the demand load. Revolution Wind will have a $0 (or even negative) marginal cost, which means that whenever the wind is blowing, ISO-NE will, with very few exceptions, dispatch Revolution Wind because it will (along with other renewable sources) have the lowest marginal cost. Therefore, it can lower wholesale energy market costs in New England, which are paid for by Connecticut ratepayers in their electric rates, by displacing more expensive marginal cost generation from fossil fuels.

31.     A December 2018 assessment by ISO-NE found that if 1,600 MW of offshore wind generation had been available in the region during an extended cold weather period from December 24, 2017, to January 8, 2018, it could have (1) lowered regional electricity production costs by $80-85 million, resulting in an $11-13 per megawatt-hour reduction in ISO-NE day-ahead energy market prices; (2) avoided emissions of 219,200 short tons of $CO_2$, reducing regional $CO_2$ emissions from electricity production during the period by 11%; and (3) avoided consumption of 5,300 short tons of coal, 1.81 billion cubic feet of natural gas, and 160,200 barrels of oil.

32.     A July 2025 study by Daymark Energy Advisors found that 3,500 MW of offshore wind generation operating in the region during the winter from December 2024 to February 2025 could have lowered regional wholesale electricity prices by 11%, saving New England ratepayers $400 million, while reducing $CO_2$ emissions by 1.8 million tons, which is equivalent to the annual emissions from nearly 400,000 passenger vehicles.

33.     By reducing reliance on fossil fuels, Connecticut's efforts to bring offshore wind energy online also help insulate the State's electricity ratepayers from price spikes and volatility associated with these fossil fuels. Fossil fuels like natural gas and oil are traded on global markets and the prices of these fuels are impacted by geopolitical events. For example, Russia's 2022 invasion of Ukraine led to increases in natural gas prices, which contributed to increased costs to generate electricity using natural gas and higher electricity bills in Connecticut. Reducing Connecticut's reliance on natural gas to generate electricity by bringing offshore wind and other renewable energy resources online helps to limit these impacts on Connecticut ratepayers.

**Connecticut's Investments in Offshore Wind Support Economic Development.**

34.    Connecticut's focus on regional collaboration, supportive policies, and strategic infrastructure investments has positioned the State as a key player in the offshore wind industry in the United States, which benefits the State's economy.

35.    In October 2023, Connecticut released an "Offshore Wind Strategic Roadmap" and launched the Connecticut Wind Collaborative, a public-private organization, to leverage the State's strengths in infrastructure, manufacturing, workforce, and research and development and to catalyze further economic growth, attract investment, and foster innovation in the State's offshore wind industry.

36.    To support Revolution Wind and other offshore wind projects, Connecticut has invested in facilities. The most prominent example is the redeveloped State Pier Terminal in New London, Connecticut (State Pier or Terminal). So far, Connecticut has spent over $200 million to redevelop State Pier into a world-class heavy-lift maritime facility and hub for offshore wind. State Pier is one of only three marshaling facilities on the East Coast that are assembling offshore wind turbines for deployment; and it was the first such facility with open ocean access.

37.    Ørsted leases the State Pier Terminal.

38.    Ørsted is using the Terminal to construct Revolution Wind. State Pier has been supporting the assembly and delivery of turbines for the project.

39.    Nationwide, the Revolution Wind project is supporting approximately 2,500 direct jobs in the construction, operations, shipbuilding, and manufacturing sectors, including approximately 1,200 jobs in Connecticut and Rhode Island. At the State Pier Terminal, more than 100 union jobs and nearly 200 jobs overall are tied directly to staging and assembly for offshore wind.

**The August 22, 2025, Revolution Wind Stop Work Order.**

40.    On August 22, 2025, BOEM—a federal agency within the Department of the Interior (DOI)—ordered Ørsted "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025." A true and accurate copy of the Stop Work Order is attached as **Exhibit 1**.

41.    The Stop Work Order provides that Revolution Wind "may not resume activities until BOEM informs you that BOEM has completed its necessary review." *See* Exhibit 1. The order does not provide a timeline for completion of this review, despite the adverse impacts of delaying this project. Such a timeline has not been provided elsewhere.

42.    BOEM stated that the Stop Work Order is intended to "ensure that all activities" are "carried out in a manner that provides for protection of the environment, among other requirements," and that it "is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in that subsection of [the Outer Continental Shelf Lands Act]." *Id.* The Stop Work Order does not explain how or in what respects BOEM believes the federal government's prior evaluations inadequately addressed these issues during the multiyear permitting process, including on the environmental or national security concerns that BOEM alleges have arisen during its review of the Revolution Wind project. The Stop Work Order does not seek any additional information related to these issues.

43.    With respect to national security specifically, the Record of Decision (ROD) for Revolution Wind's COP, issued by BOEM, the Department of Defense (U.S. Army Corps of

11

Engineers), and the Department of Commerce (National Marine Fisheries Service) on August 21, 2023, notes "[a]t each stage of the regulatory process . . . BOEM has consulted with the [Department of Defense] for the purposes of assessing national security considerations in its decision-making processes." The ROD states national security impacts from developing offshore wind in the Revolution Wind project's lease area "would be negligible and avoidable." The ROD further states BOEM in coordination with the Department of Defense, developed specific mitigation measures for the project to protect national security. As documented separately in the COP, development of the Revolution Wind project leading up to BOEM's November 2023 COP approval involved numerous meetings between the developer and relevant federal and state agencies, including the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, North American Aerospace Defense Command, U.S. Army Corps of Engineers, and Federal Aviation Administration. BOEM's Stop Work Order does not provide any details on what specific national security concerns would justify ordering Revolution Wind to stop work. The Stop Work Order also does not explain why the prior extensive review of national security by BOEM and other federal agencies, or the existing conditions that BOEM incorporated into its COP approval for the project, were insufficient.

**Connecticut's Interest in Revolution Wind and Harm from the Stop Work Order.**

44.    Connecticut has a strong interest in the timely completion of Revolution Wind.

45.    DEEP selected the project to provide electricity and RECs to Connecticut through contracts with the State's electric distribution companies to help meet the State's energy, climate, and RPS needs and requirements.

46.    Until the Stop Work Order, Revolution Wind was actively under construction, both onshore and in federal waters. The project is approximately 80% complete. All its offshore foundations are installed, as are 45 of its 65 turbines.

47.    The project received all required federal and state permits, including final approval of its COP from BOEM on November 20, 2023.

48.    In total, Revolution Wind went through more than a decade of reviews across multiple federal administrations, from lease area identification and execution to final federal permitting of the project.

49.    The project began offshore construction in 2024 and has been on track to reach commercial operation and begin delivering power and RECs in the second half of 2026 to Connecticut, Rhode Island, and the New England regional grid.

50.    Both Connecticut and ISO-NE have been counting on Revolution Wind to come online to contribute to grid reliability. In total, the 704 MW Revolution Wind project would supply power sufficient to meet about 2.5% of New England's regional electricity load.

51.    On August 25, 2025, in response to the Stop Work Order, ISO-NE warned that delaying the Revolution Wind project would "increase risks to reliability," including potential "near-term impacts to reliability in the summer and winter peak periods," and "adversely affect New England's economy and industrial growth." ISO-NE also stated that "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future."

52.     ISO-NE's analysis demonstrated the importance of bringing offshore wind online for regional reliability, particularly during the winter months, which is when the New England grid currently faces its greatest reliability challenges. While offshore wind projects provide energy throughout the year, they perform especially well in the winter. This coincides with when natural gas supplies are often constrained for electricity production because the demand for natural gas for heating uses increases. ISO-NE's analysis shows that offshore wind can help reduce reliance on natural gas and other fossil fuels, helping to prevent fuel shortages, reduce price volatility, and strengthen grid reliability—again, especially during the winter.

53.     Connecticut also is specifically counting on the State's 304 MW share of Revolution Wind to meet approximately 5% of the State's own electric distribution company load, and to contribute the same percentage in renewable, zero-carbon electricity toward Connecticut's RPS and 100% zero-carbon electricity supply requirements, once the project comes online in 2026.

54.     Once operational, Revolution Wind will save Connecticut ratepayers money. The Revolution Wind contracts are expected to act as a successful hedge against rising electricity rates in the future as the fixed contract prices for Revolution Wind are lower than the average projected cost of energy and RECs over this period. As noted above, Revolution Wind also will lower electricity costs for Connecticut and the region by bringing online more zero-marginal cost energy. Anticipated savings from the contract to Connecticut ratepayers are hundreds of millions of dollars over the contract.

55.     The State itself is a ratepayer. The five-year average electricity consumption for Connecticut executive branch agencies between fiscal years 2019 and 2023 was over 270,000 kilowatt-hours (kWh). In 2023, for example, executive branch agencies consumed over 260,000 kWh. In 2023, the average retail electricity rate across all ratepayers in Connecticut was 24.24

cents/kWh, according to the U.S. Energy Information Administration. If the State paid this average electricity rate, the State paid approximately $63 million for electricity in 2023. This simplified approach does not take into account the different rates that individual State accounts are charged, and it includes rates of municipal electric cooperatives in addition to the electric distribution companies that contracted with Revolution Wind. This estimate therefore is not a complete account. Rather, the estimate provides an order of magnitude of costs and underscores that the State is a significant ratepayer and therefore has a real interest in reducing costs that is distinct from the significant interest it also has in achieving the lowest possible electric rates for its residents.

56.    If BOEM's Stop Work Order prevents the fully permitted and mostly constructed Revolution Wind project from entering service in 2026 as planned, Connecticut ratepayers, including the State itself, would not receive these electric bill savings. The result instead would be tens of millions of dollars in higher electricity costs on average for Connecticut ratepayers each year. The potential cost to Connecticut ratepayers and to the State's broader economy could be much higher, because, as ISO-NE has warned, the loss or delay of Revolution Wind also "will increase risks to reliability" in the region.

57.    As described above, Revolution Wind supports about 1,200 jobs in Connecticut and Rhode Island alone, including more than 100 union jobs and nearly 200 jobs at State Pier. The project is supporting approximately 2,500 jobs across the country. A recent study by the Connecticut Wind Collaborative found that at least 50 Connecticut companies are working on offshore wind and associated port development. The Stop Work Order has and will continue to impact the employment of hundreds of people living and working in Connecticut and Rhode

Island. Connecticut will experience negative financial and social repercussions if they lose those jobs.

58.    Connecticut has spent over $200 million to redevelop the State Pier Terminal into a world-class heavy-lift maritime facility and hub for offshore wind. The developers of Revolution Wind, which are the first tenants of the redeveloped facility, have further contributed approximately $100 million to the redevelopment.

59.    The Stop Work Order, unless lifted in time, will harm Connecticut's interests at the State Pier Terminal. For example, the State Pier Terminal was redeveloped to be a heavy-lift facility able to service offshore wind projects. The Stop Work Order threatens to chill or put a halt to that industry. A Harbor Development Agreement was reached between the Connecticut Port Authority, the developer, and terminal operator, including a 10-year sublease to coincide with near-term regional project development. A shift in cargo accommodation due to a wind down in wind activities is a complex arrangement that requires months or years of advance booking time.

60.    The Connecticut Port Authority, a quasi-public agency, owns the State Pier Terminal, and much of the profits from the State Pier Terminal lease are reinvested into the State.

61.    As described above, Connecticut is counting on Revolution Wind to provide renewable, zero-carbon electricity sufficient to meet approximately 5% of the State's load once the project comes online in 2026, which is a significant contribution toward achieving both the RPS and the State's 100% zero-carbon electricity supply by 2040 requirements. These planned contributions from Revolution Wind have been incorporated into the State's energy plans, including the IRP.

62.    The Stop Work Order, unless it is lifted in time to enable Revolution Wind to move forward, will force Connecticut to expend duplicate resources to follow the State's statutory

mandates to mitigate climate change by procuring an appropriate replacement to the power and RECs to be purchased from the Revolution Wind Project. There are no readily available substitutes for this zero-carbon energy. If Revolution Wind cannot come online as scheduled, it will likely be years before Connecticut is able to secure replacement zero-carbon energy. Connecticut already was facing a challenge in securing significant zero-carbon and renewable energy to meet the State's statutory requirements, even with Revolution Wind.

63.     The Stop Work Order is likely to undermine investor confidence and set a chilling precedent for future projects. This type of shock to the industry hurts Connecticut's investments to support this industry. This type of shock also damages the credibility of regional energy markets.

64.     In conclusion, the Stop Work Order, which halted the fully-permitted and mostly-constructed Revolution Wind project, immediately harms and will continue to harm the State of Connecticut and its residents, including by undermining compliance with the State's climate and renewable energy laws; damaging grid reliability; forcing reliance on other, more environmentally damaging, import-constrained, and price-volatile sources of electricity; increasing electricity rates to consumers and hurting the State's economy through job losses, foregone job creation, and long-term damage to the development of the wind energy industry in the State.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, Connecticut on September 16, 2025.


Katherine S. Dykes

Commissioner of the Connecticut Department of
Energy and Environmental Protection

17

# Exhibit 2



# United States Department of the Interior

### BUREAU OF OCEAN ENERGY MANAGEMENT
### WASHINGTON, DC  20240-0001

Director's Order
December 22, 2025

Rob Keiser
Head of Asset Management
Orsted North America Inc.
399 Boylston Street, 12th Floor
Boston, MA 02216
College Park, MD 20740-6001
Email: robek@orsted.com

Dear Mr. Keiser:

The Bureau of Ocean Energy Management (BOEM) is issuing this Director's Order to Revolution Wind, LLC, pursuant to 30 C.F.R. § 585.417(b), to suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security.  During this time, BOEM will coordinate with you to determine whether the national security threats posed by this project can be adequately mitigated.

In November 2025, the Department of War (DoW) completed an additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects. These impacts are heightened by the projects' sensitive location on the East Coast and the potential to cause serious, immediate, and irreparable harm to our great nation.

Based on BOEM's initial review of this classified information, the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities.  In coordination with DoW, BOEM will determine whether the national security threats relating to this project can be mitigated and invites you to meet and confer about that possibility.  Given the construction status of this project, BOEM will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled.

Finally, while BOEM and DoW endeavor to reach a determination on feasible mitigation measures within 90 days following the date of this letter, BOEM may further extend the 90-day suspension period based on the status of those discussions.  Even though all ongoing activities at this project are suspended, you may perform any activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment over the next 90 days and during any subsequent extensions.



# United States Department of the Interior

## BUREAU OF OCEAN ENERGY MANAGEMENT
### WASHINGTON, DC  20240-0001

Please contact me at Matthew.Giacona@boem.gov or (202) 208-6300.  I appreciate your attention to this matter and look forward to hearing from you quickly.


Sincerely,



Matthew N. Giacona
Acting Director